**Everett D. DEHAHN**

v.

**Richard A. INNES.**

Supreme Judicial Court of Maine.

April 22, 1976.

Rocheleau & Fournier, P. A., by Paul C. Fournier, Lewiston, for plaintiff.

Thomas F. Kinnelly, III, Raymond, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, WERNICK and ARCHIBALD, JJ.

DUFRESNE, Chief Justice.

The defendant, Richard A. Innes, appeals from a judgment in favor of the plaintiff, Everett D. Dehahn, in the amount of $8,800.00 arising out of a civil complaint for breach of contract. The case was heard by a single Justice of the Superior Court (Kennebec County) jury-waived. We sustain the appeal on the issue of damages only.

The facts giving rise to the complaint may be summarized as follows:

Until March, 1972 Mr. Dehahn was road commissioner for the Town of Wayne. In his work for the town he used, for the most part, his own heavy equipment and was compensated for his services at an hourly rate. Failing reelection at the annual town meeting in 1972, the plaintiff sought to interest the defendant and one King to purchase his business, including incidental goodwill, for the price of $60,000.00.

After Mr. King withdrew from the negotiations, the plaintiff and the defendant further explored the possibilities of reaching an agreement of purchase and sale, which they did at the end of April. By oral contract, so the presiding Justice found, Dehahn agreed to sell and Innes agreed to buy for the price of $35,000.00 the plaintiff's 52 acre gravel pit, a back hoe, a bulldozer, a loader, a dump truck with plow, another truck with plow and a home-made low bed trailer. The Justice found that the parties had receded from the original intent to sell and buy the business as such.

The plaintiff had agreed to deliver the equipment in a "ready-to-go condition." In compliance with this part of the agreement the plaintiff sent his employee Riggs to do the job which needed to be done such as the removal of the plows from the trucks, plus such other maintenance work as was necessary. Most of the plaintiff's equipment, with the defendant's consent, had already been moved by the plaintiff to the defendant's field across from the driveway to his home, with the keys to the equipment left in the machines. It is conceded that Mr. Riggs did work on the equipment, with the assistance of the defendant Innes, for somewhat less than a full day.

There was evidence that Innes did use the bulldozer on a job prior to his rescission of the agreement. Whether this use was at the request and for the benefit of the plaintiff or as part of the defendant's new business undertaking was a matter for the presiding Justice to settle as a question of fact on disputed testimony.

After numerous complaints about the plaintiff's failure to put the equipment in a "ready-to-go condition," the defendant informed the plaintiff that he was cancelling the agreement and no payments were ever made pursuant to the contract.

The issues raised for our consideration concern 1) the applicability of the statute of frauds to the oral transaction, 2) whether the defendant's conduct amounted to a breach of the agreement and 3) the propri-

ety of the amount of damages awarded by the presiding Justice.

### I. The Statute of Frauds

The contract between the parties was not in writing. The defendant contends it is unenforceable for that reason. Our statutes in pertinent part provide as follows:

" "No action shall be maintained in any of the following cases:

4. Upon any contract for the sale of lands, tenements or hereditaments, or of any interest in or concerning them;

\*     \*     \*     \*     \*     \*

unless the promise, contract or agreement on which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith, or by some person thereunto lawfully authorized; . . . ." 33 M.R.S.A., § 51.

"Except as otherwise provided in this section, a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or his authorized agent or broker. . . . ." 11 M.R.S.A., § 2–201(1).

Furthermore, viewing the agreement between the parties as an "entire" contract, the defendant, relying on *Brown v. True,* 1923, 123 Me. 288, 122 A. 850, asserts that, if the contract is entire and part is within the statute, it is unenforceable as a whole, and no action can be maintained to enforce the part which would not have been affected by the statute if it had been separate and distinct from the other part. Id. 290, 122 A. 850.

■ The defendant's contention is correct that we must view the oral agreement between the parties as an "entire" contract having dual aspects, 1) the sale and purchase of land and 2) a bargain respecting personal property.

■ The fixing of unit prices to ascertain the overall single price of the contract as a whole would not be conclusive of severability of the contract. *Levine v. Reynolds,* 1947, 143 Me. 15, 21, 54 A.2d 514.

■ The true test is whether the parties assented to all the promises *as a single whole,* so that there would have been no bargain whatever if any promise or set of promises were struck out. *Brown v. True,* supra, 123 Me. at page 290, 122 A. 850.

■ Thus, the severability or entirety of a contract depends upon the intent of the contracting parties and in the case of an oral contract is a question of fact for the fact-finder. *Levine v. Reynolds,* supra, 143 Me. at page 21, 52 A.2d 514.

■ It is the duty of the fact-finder to determine the existence of the parol contract, its extent and limitations, in other words, to find not only what language was used, but its purport and meaning. *Herbert v. Ford,* 1851, 33 Me. 90, 93.

■ Although the Justice below made no specific finding of fact in relation to the severability or entirety of the verbal contract, it is clear from his decision that he treated the same as an "entire" contract. The record supports such a decision, since the negotiations were carried on in terms of a total price and unit prices were introduced into evidence only in proof of damages on resale. We cannot say that the Justice below was clearly wrong in such preliminary underlying implied finding of fact involved in his ultimate finding favorable to the plaintiff. See *Jacobs v. Boomer,* 1970, Me., 267 A.2d 376; *Blue Rock Industries v. Raymond International, Inc.,* 1974, Me., 325 A.2d 66.

■ Findings of fact, whether express or implied, shall not be set aside unless

clearly erroneous. *Gay v. Gay's Super Markets, Inc.*, 1975, Me., 343 A.2d 577; *Cobb v. Cougle*, 1976, Me., 351 A.2d 110.

■ Had the parties in their verbal contract dealt solely with the sale and purchase of "goods" within the meaning of the Uniform Commercial Code, the contract would be legally enforceable notwithstanding the express requirements of the statute of frauds contained in 11 M.R.S.A., § 2–201(1).

The Code provides the following exception:

11 M.R.S.A., § 2–201(3)

"A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

\*　\*　\*　\*　\*　\*

"(b) If the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; \* \* \*."

■ By this change in the statute of frauds, the Legislature had in mind to expand the exceptions to the statutory rule of nonenforceability concerning oral agreements relating to the sale of goods. Although limited in scope, this provision of the Code was intended to deny the benefit of the statute of frauds to one who in court, whether by pleading, testimony or otherwise, admits the existence of the oral contract sued upon. The ultimate design of this legislation is to limit the use of the statute of frauds as a shield against unfounded fraudulent claims resting in parol, while removing from the arsenal of an unscrupulous litigant an unrighteous defense against a just claim. See *Garrison v. Piatt*, 1966, 113 Ga.App. 94, 147 S.E.2d 374.

Since part of the consideration for the price in the instant oral agreement consisted of real estate, we must have in mind the provisions of 11 M.R.S.A., § 2–304(2), which state:

"Even though all or part of the price is payable in an interest in realty, the transfer of the goods and the seller's obligations with reference to them are subject to this Article, but not the transfer of the interest in realty or the transferor's obligations in connection therewith."

■ From a reading of subsection (2) of section 2–304 and the comments of the drafters of the Code, it is apparent that the Code is concerned only with the transfer of title to goods and not with the transfer of title to realty which must be left "to the courts and other legislation."

As stated in the Uniform Commercial Code Comment (11 M.R.S.A., Vol. 4, at page 108):

"However, the complexities of these situations may be such that each must be analyzed in the light of the underlying reasons in order to determine the applicable principles. Local statutes dealing with realty are not to be lightly disregarded or altered by language of this Article. In contrast, this Article declares definite policies in regard to certain matters legitimately within its scope though concerned with real property situations, and in those instances the provisions of this Article control."

The issue before us is, whether the instant "entire" contract resting in parol is unenforceable where part thereof involves real estate and, thus, brings it within the scope of the statute of frauds (33 M.R.S.A., § 51(4) ) relating to "the sale of lands, tenements or hereditaments, or of any interest in or concerning them."

■ Our Court has stated that the object of statutes of fraud is "to prevent perjury and fraud." Such statutes affect the remedy only and not the validity of the contract. A defendant may waive the protection of the statute, admit verbal evi-

dence of the contract and become bound by it. *Bird v. Munroe,* 1877, 66 Me. 337.

■ If a defendant permits evidence of a parol agreement relating to land to be introduced without objection, he becomes bound by it. *Lawrence v. Chase,* 1866, 54 Me. 196, 201.

Having admitted the oral agreement respecting lands, which was valid at common law, and having avoided the mischief against which the statute of frauds was directed, the defendant, in *Douglass v. Snow,* 1885, 77 Me. 91, was ordered to convey specifically the premises involved. See also, *Lovejoy v. Coulombe,* 1957, 152 Me. 385, 397, 131 A.2d 450.

We take notice that Rule 8(e)(2) permits a party to state "as many separate claims or defenses as he has regardless of consistency." In the instant case, the defendant did plead the statute of frauds as an affirmative defense, but that defense was not actively pursued at trial. In fact the defendant freely admitted in his testimony the existence of the oral agreement. At no time did he object to the evidence of the oral conversations between the parties which resulted in a meeting of the minds upon a valid contract.

■ The statute of frauds was enacted for the purpose of preventing frauds and the courts will not condone its use for a fraudulent purpose. *Gosselin v. Better Homes, Inc.,* 1969, Me., 256 A.2d 629; *McGuire v. Murray,* 1910, 107 Me. 108, 115, 77 A. 692.

■ We note that the present contract is predominantly a contract for the sale and purchase of goods and that the gravel pit involved represented only about 5% of the total price agreed upon. Under the circumstances of this case, we hold that the salutary principle embodied in 11 M.R. S.A., § 2–201(3)(b) applicable to a contract for the sale of goods alone should apply equally to the instant oral contract involving both goods and real estate.

The Maryland Court in *Trossbach v. Trossbach,* 1945, 185 Md. 47, 42 A.2d 905 expressed the rule in the following precise terms, which we approve:

"[T]he purpose of the Statute of Frauds is to protect a party, not from temptation to commit perjury but from perjured evidence against him. The purpose of evidence is to prove facts. Admissions of a party in testifying, though in form evidence, are in essence not mere evidence, but make evidence against him unnecessary. . . . We think the Statute of Frauds requires *no* more."

See also *Alter & Sons, Inc. v. United Engineers & Constructors, Inc.,* 1973, 366 F. Supp. 959; *Providence Granite Co., Inc. v. Joseph Rugo, Inc.,* 1972, 362 Mass. 888, 291 N.E.2d 159; *Hale v. Higginbotham,* 1972, 228 Ga. 823, 188 S.E.2d 515; *Cohn v. Fisher,* 1972, 118 N.J.Super. 286, 287 A.2d 222, 227; *Lehner v. Montgomery,* 1956, 180 Pa.Super. 493, 119 A.2d 626; *Zlotziver v. Zlotziver,* 1946, 355 Pa. 299, 49 A.2d 779.

■ We have applied to the instant transaction the principle of even-handed justice adopted by the Uniform Commercial Code and concluded that the verbal agreement between the parties was enforceable, notwithstanding that the reference "entire" contract involved both 1) "goods" within the meaning of Section 2–105(1)[1] of the Code such as the heavy equipment which constituted the predominant part of the deal and 2) nongoods such as the gravel pit realty. We now turn our attention to the provisions of the Code ap-

---

1. 11 M.R.S.A., § 2–105(1) provides in pertinent part:

"'Goods' means *all things* (including specially manufactured goods) which are *movable* at the time of identification to the contract for sale other than the money in which the price is to be paid, . . . ." Emphasis supplied.

plicable to the sale of "goods" to determine whether the defendant's conduct constituted a breach of the oral contract. See *Foster v. Colorado Radio Corporation*, 1967, 10 Cir., 381 F.2d 222.

## II. Tender of Delivery

On the issue of tender of delivery the evidence was conflicting. The plaintiff asserts that the removal of the equipment, with the keys in the machines, to the defendant's field near the defendant's home was a tender of delivery within the meaning of Section 2–507 of the Code,[2] while the defendant characterizes the removal as a mere accommodation for the benefit of the plaintiff who had to quit town property where the equipment was kept when the plaintiff held the office of road commissioner.

While no explicit finding was made on this issue by the presiding Justice, he did state in his decision that "[p]artial steps toward the implementation of the contract were taken . . . ." We believe that implicit in this statement is the Justice's conclusion that the removal of the equipment to the defendant's field was found by him to be such a surrender of possession by the plaintiff to the defendant as to constitute a tender of delivery. We believe that there is substantial evidence in the record to support this conclusion.

The defendant admitted that his attorney would be drafting the documents necessary to implement the sale. A fortiori, when in mid-May, 1972 the plaintiff was advised that the sale was off, tender of a deed of the gravel pit was then excused as a useless gesture and failure to make tender is no bar to recovery for breach of this "entire" mixed contract involving "goods" and nongoods. The rejection of the whole contract by the defendant

rendered unnecessary any requirement, or necessity, by the plaintiff to proceed further with the agreement and tender a deed of the realty to the defendant. The purpose of a tender is to put the other party in violation. When the other party has already repudiated the agreement, a tender would be a futile act and is not required by law. It is a well established rule of law that a tender is excused where such tender would be a useless and idle ceremony. See *Duval v. Steele*, 1970, Ky., 453 S.W.2d 14, 18; *Vachon v. Tomascak*, 1967, 155 Conn. 52, 230 A.2d 5; *Farnsworth v. Cochran*, 1965, 125 Vt. 174, 212 A.2d 818; *Spann v. Joint Boards of School Directors*, 1955, 381 Pa. 338, 113 A.2d 281, 285; *Leigh v. Rule*, 1954, 331 Mass. 664, 121 N.E.2d 854.

## III. Acceptance of the Goods

True, the tendered "goods" were not in full conformity with the terms of the verbal contract since the parties had agreed that the "goods" would be in a "ready-to-go" condition. Nevertheless, the presiding Justice found that the "[d]efendant's claim of rescission because of a breach on the part of Plaintiff represents an unsubstantiated position." In order so to decide, the Justice below had to conclude, as an underlying fact, that the defendant, notwithstanding his protests of defective operational condition of the equipment, had not rejected the contract outright, but had accepted the goods with reasonable expectation that the defects would be corrected. In this, the record supports him. There was evidence to the effect that the defendant himself did work on the equipment to put it in proper condition and that he used some of the machinery for his own purposes.

The Uniform Commerical Code (11 M.R.S.A., § 2–606) provides:

2. 11 M.R.S.A., § 2–507 provides as follows: "(1) Tender of delivery is a condition to the buyer's duty to accept the goods and, unless otherwise agreed, to his duty to pay

for them. Tender entitles the seller to acceptance of the goods and to payment according to the contract."

"(1) Acceptance of goods occurs when the buyer

\*     \*     \*     \*     \*     \*

(c) Does any act inconsistent with the seller's ownership;

\*     \*     \*     \*     \*     \*

. . ."

Whether there is an acceptance of goods by reason of acts of the buyer inconsistent with the seller's ownership within the provision of 11 M.R.S.A., § 2–606(1)(c) is a question of fact for the trier of facts to be determined from the evidence in each particular case. *Marine Mart, Inc. v. Pearce,* 1972, 252 Ark. 601, 480 S.W.2d 133; *Cervitor Kitchens, Incorporated v. Chapman,* 1972, 7 Wash.App. 520, 500 P.2d 783.

In resolving this issue in favor of the plaintiff, we cannot say that the single Justice was clearly wrong.

### IV. Revocation of Acceptance

■■■ An acceptance of nonconforming goods upon the reasonable expectation that their nonconformity will be corrected may be rightfully revoked under certain circumstances. An indispensable requirement of revocability under the Code for nonconformity is that the nonconformity of the goods *substantially* impairs their value to the accepting party.[3]

■ The underlying reason for requiring a substantial impairment of value to legitimize a revocation of acceptance under 11 M.R.S.A., § 2–608(1)(a) is to bar revocation for trivial defects or defects which may be easily corrected. *Rozmus v. Thompson's Lincoln-Mercury Co.,* 1966, 209 Pa.Super. 120, 224 A.2d 782, 784.

3. 11 M.R.S.A., § 2–608 provides:
   "(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity *substantially* impairs its value to him if he has accepted it
   (a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

■ The presiding Justice found that the nonconformity of the goods delivered and accepted could be easily remedied at the cost of no more than two hundred ($200.00) dollars, which he considered as a "de minimis" expense and an insufficient basis for revocation of acceptance by the defendant. In so deciding, the Justice impliedly found no substantial impairment of value. On this aspect of the case, we cannot say that he was clearly wrong.

### V. Damages

The presiding Justice adjudged the plaintiff's damages for the defendant's breach of contract in the amount of eight thousand eight hundred ($8,800.00) dollars. He reached this ultimate monetary award after finding as a fact that the total price of the equipment and land to which the parties had agreed was thirty-five thousand ($35,000.00) dollars from which he subtracted the sum of twenty-six thousand two hundred ($26,200.00) dollars, the aggregate values he ascribed respectively to 1) the equipment which the plaintiff resold following the defendant's revocation of acceptance ($25,500.00 resale price), 2) the home-made low bed trailer retained by the plaintiff ($500.00) and 3) the cost of services to cure nonconformity ($200.00).

■ In doing so, we believe the single Justice used the proper measure of damages by applying the generally accepted rule that, when the buyer unjustifiably revokes his acceptance of the goods which he contracted to buy, as well as when he fails to receive and pay for the goods, the seller may recover the difference between the contract price and the fair market value of the goods at the time of the breach. *Bonney v. Blaisdell,* 1909, 105 Me. 121, 73 A. 811; *Tufts v. Grewer,* 1891, 83 Me. 407, 22 A. 382.

\*     \*     \*     \*     \*

. . ."

(Emphasis added)

The Code is declaratory of the former Maine law in this respect. Under 11 M.R.S.A., § 2–709(3), it is provided:

"(3) After the buyer has wrongfully rejected or revoked acceptance of the goods . . ., a seller who is held not entitled to the price under this section shall nevertheless be awarded damages for nonacceptance under section 2–708."

Section 2–708(1) in turn states:

"(1) Subject to . . ., the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article (section 2–710), but less expenses saved in consequence of the buyer's breach."

■■■ Similarly, unless otherwise stipulated in the contract itself, the same general rule applies to contracts involving real estate, the proper measure of damages being the difference between the contract price and the market value of the property at the time of breach of the contract. *Robinson v. Heard*, 1839, 15 Me. 296, 303; *Towne v. Larson*, 1947, 142 Me. 301, 51 A. 2d 51; *Makusevich v. Gotta*, 1928, 107 Conn. 207, 139 A. 780; *Furlow v. Sturgeon*, 1969, Ky., 436 S.W.2d 485; *Kasten Construction Company v. Jolles*, 1971, 262 Md. 527, 278 A.2d 48.

The defendant, however, claims that in the instant case the plaintiff could not recover at all, because he failed to give the defendant reasonable notification of his intention to resell at private sale as provided in 11 M.R.S.A., § 2–706.[4] The situation is not comparable to that in *Camden National Bank v. St. Clair*, 1973, Me., 309 A.2d 329, where this Court held that compliance with the requirements of the Uniform Commercial Code for notification as to disposition of collateral in a foreclosure-type procedure was a condition precedent to a secured creditor's right to recover the deficiency remaining due on the secured instrument.

The Court, in *Camden National Bank*, carried over into the Uniform Commercial Code the public policy doctrine espoused in *C. I. T. Corporation v. Haynes*, 1965, 161 Me. 353, 212 A.2d 436, to the effect that a debtor's right to redeem his collateral in a secured transaction cannot be foreclosed except in strict compliance with the mandatory requirements of the statute.

Furthermore, in *Camden National Bank*, we pointed out that a right of action established by one section of the Code, absent clear expression to the contrary, "must be held cumulative in the context of remedies previously, or otherwise, afforded." Such construction implements the mandate of 11 M.R.S.A., § 1–106 which says in part that "[t]he remedies provided by this Title shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." Id. 332.

■■■ We hold that Section 2–703 which enumerates the seller's remedies, where the buyer wrongfully rejects or revokes acceptance of goods, are cumulative as between the right to

"(4) Resell and recover damages as hereafter provided (section 2–706);" and

---

4. 11 M.R.S.A., § 2–706 provides in pertinent part:
"(1) Under the conditions stated in section 2–703 on seller's remedies, the seller may resell the goods concerned or the undelivered balance thereof. Where the resale is made in good faith and in a commercially reasonable manner, the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of this Article (section 2–710), but less expenses saved in consequence of the buyer's breach.
 *    *    *    *    *
"(3) Where the resale is at private sale the seller must give the buyer reasonable notification of his intention to resell."

"(5) Recover damages for nonacceptance (section 2–708) or in a proper case the price (section 2–709)."

Such was the conclusion of the drafters of the Code. See Maine Code Comment, Vol. 4 of the Maine Revised Statutes Annotated, page 307 under subsection (3) of section 2–706 of the Code.

The record is silent concerning the type of resale involved in the instant case. But, assuming that the plaintiff did resell at private sale as contended by the defendant, we would find no difficulty in sustaining the presiding Justice in his use of the resale price as evidence of market values of the property resold.

Although the plaintiff testified only in terms of the selling prices he received for the several articles of equipment and the land he resold, it is evident that the Justice below equated the plaintiff's testimony as an expression of opinion by the owner respecting the value of his properties, since he did testify, in relation to the home-made low bed trailer kept by him, that it was worth about $500.00.

Maine stands with the weight of authority in holding an owner of goods or of real estate, by reason of his owner-relationship alone, competent to express his opinion of their value. *Simmons v. State,* 1967, Me., 234 A.2d 330.

Furthermore, the resale price of goods or real estate is competent relevant evidence of probative evidentiary force to establish values. *Norton v. Willis,* 1882, 73 Me. 580; *Mullen v. Eastern Trust and Banking Co.,* 1911, 108 Me. 498, 505, 81 A. 948.

In *Norton,* our Court said:

"It is a common thing to allow competent witnesses to give their opinions as to what property is worth and how much it would probably sell for. *A fortiori,* is it proper to prove how much the property has in fact sold for. It is sometimes competent to show how much similar property has sold for, in order to arrive at the value of property in question. And it would be strange if it were improper to show the price at which the same property was sold for." (Emphasis in original)

Assuming, however, that the evidence could have been excluded upon objection because of the form in which it was introduced, nevertheless it was received without any objection whatsoever, and was "consent evidence" to be considered by the factfinder and given its natural and logical probative effect. *Goldthwaite v. Sheraton Restaurant,* 1958, 154 Me. 214, 145 A.2d 362, 79 A.L.R. 881.

It is apparent from the record that the Justice below accepted the resale prices to which the plaintiff testified as the values of the properties involved at the time of the breach of contract. The defendant's revocation of acceptance was placed at the latest in mid-May 1972. The trial took place on January 8, 1974. There is no evidence as to when the resale of each piece of equipment or of the land took place within that period of time. The Justice in response to a request for additional findings by the defendant had this to say:

"There was no evidence or indication that the plaintiff received less than the value of the components when he sold them. This value is determined to be what he received for them."

Notwithstanding its status as consent evidence, the weight thereof, absent any other explanatory circumstances, depended as to its strength or weakness upon the closeness in time the resales were to the time of the breach. If the resale time is different or later than the time of the breach, then evidence should be adduced as to the difference, if any, in the market value between the two dates. *Bouchard v. Orange,* 1960, 177 Cal.App.2d 521, 2 Cal. Rptr. 388; *Royer v. Carter,* 1951, 37 Cal.2d 544, 233 P.2d 539, 542.

While the sale price of property subsequent to the time when the contract was breached may be considered as some indication of the market value at the time of breach, it is not conclusive and the actual market value at the time of breach should be properly established and not left to speculation. *Andreasen v. Hansen,* 1959, 8 Utah 2d 370, 335 P.2d 404; *Valdez v. Christensen,* 1965, 89 Idaho 285, 404 P.2d 343; *Aboud v. Adams,* 1973, 84 N.M. 683, 507 P.2d 430, 436.

In using the resale price of the equipment and land to determine the difference between the market value at the time of the breach and the unpaid contract price in measurement of the plaintiff's loss by reason of the defendant's unjustified revocation of acceptance of the goods and land, it was the ultimate burden of the plaintiff, in an action for the recovery of damages based on Section 2–708, not only to show the nonlikelihood of a change in market value of the property involved between the date of the breach and that of the resale, but also that the resale was fair and made in good faith, i. e. in the exercise of reasonable care and judgment. See *Obrecht v. Crawford,* 1938, 175 Md. 385, 2 A.2d 1, 119 A.L.R. 1129; *Howse v. Crumb,* 1960, 143 Colo. 90, 352 P.2d 285, 81 A.L.R. 2d 1350; *Jack Richards Aircraft Sales, Inc. v. Vaughn,* 1969, 203 Kan. 967, 457 P.2d 691.

The record is silent as to the time of the resales and the circumstances surrounding them. In this respect, the plaintiff failed to sustain his burden of proof as to the extent of the damages to which he is entitled.

The entry will be

Appeal denied as to the issue of liability.

Appeal sustained as to the issue of damages.

Remanded to the Superior Court for further proceedings.

POMEROY, J., did not sit.

DELAHANTY, J., sat at argument but did not participate further in the case.

All Justices concurring.