CONTINENTAL CAN CO., INC., Plaintiff,

v.

POULTRY PROCESSING, INC., Defendant.

Civ. No. 86–0051 P.

United States District Court, D. Maine.

Dec. 2, 1986.

Thomas A. Cox, John D. McKay, Petruccelli, Cohen, Erler & Cox, Portland, Me., for plaintiff.

William B. Jordan, Reef, Jordan & Hrycay, Portland, Me., for defendant.

## OPINION & ORDER

GENE CARTER, District Judge.

Plaintiff, Continental Can Company, Inc., seeks in this action to recover sums due Plaintiff for the shipment of goods, specifically cans and can ends (cans), for which Plaintiff alleges Defendant, Poultry Processing, Inc., had assumed the duty to pay on behalf of nonparty Medomak Canning Company. Plaintiff is a Delaware corporation with its principal place of business in Wayne, New Jersey. Defendant is a Maine corporation with its principal place of business in Portland, Maine. Jurisdiction is properly founded on diversity of citizenship under 28 U.S.C. § 1332 (1982). The

amount in controversy is alleged to be $147,464.99 and thus exceeds the jurisdictional prerequisite of $10,000, exclusive of interests and costs. Plaintiff's claim is based on three separate components: (1) $137,584.89 for cans shipped between May 30th and July, 1985; (2) $3,304.60 for cans shipped during September and October, 1985; and (3) $6,575.50 for service charges on both amounts through February 6, 1986, the ·date of the Complaint. Immediately prior to trial, Defendant agreed that it was liable for both the $3,304.60 and the service charges applicable to that amount. The subsequent trial, therefore, involved only the amount of $137,584.89 for the May 30th–July shipments and the service charges applicable to that sum.

## I. Findings of Fact

Defendant is a diversified food processing company with interests in poultry, seafood, and real estate. The company is run by George I. Lewis. Mr. Lewis's two sons, David and Bernard, also run their own businesses: Bernard is president and sole shareholder of nonparty Medomak Canning Company; David is president of Bayside Enterprises, the parent corporation of Defendant. The stipulations and testimony before the Court reveal an intricate web of inter-relationships among these entities and individuals. Both Bernard and George Lewis are directors of Bayside Enterprises, George Lewis is also an officer. Bernard Lewis is also a director of Defendant. In addition, Bernard Lewis drew a substantial salary from Defendant in 1985 and participated with others in the management of Defendant under the supervision of George Lewis. Dun & Bradstreet, Inc. lists Bernard Lewis as a vice president of Defendant. Although nonparty Medomak exists as a separate company, both Defendant and Bayside Enterprises were its creditors, holding in 1985 notes exceeding $1 million in value.

The business relationship between Plaintiff and Medomak spanned over a decade. At the time this controversy arose, Plaintiff had been both supplying Medomak with all the cans Medomak required in its food processing operations and advancing Medomak credit for those purchases under the terms of a five-year contract that commenced on May 1, 1984. In May 1985, Plaintiff became concerned about Medomak's ability to pay its outstanding balance of more than $1 million. After Medomak informed Plaintiff that it would continue to experience financial losses in the current year, Plaintiff arranged a meeting on May 29, 1985 among Linda Young and H. Stanfield for Plaintiff, Bernard Lewis for Medomak, and George Lewis for Defendant. The purpose of this meeting was to devise a method of paying Plaintiff so that Plaintiff would continue to ship cans to Medomak—cans that Medomak required to continue its operations and that Plaintiff would not ship unless paid. There is no dispute that the method of payment to be discussed was to be financial assistance from George Lewis.

George Lewis participated in only the first portion of this meeting. Although his trial and deposition[1] testimony is replete with inconsistencies and contradictions, George Lewis has clearly admitted to the Court that he agreed at this meeting to pay Plaintiff for all cans delivered under the contract after the date of the meeting. George Lewis then left the meeting and allowed Bernard Lewis to make the necessary arrangements with Plaintiff to implement the agreement reached. George Lewis never participated in any specific discussions regarding the terms of this agreement. Plaintiff summarized its understanding of the agreement in a letter dated May 30, 1985 from Linda Young to Bernard Lewis in which Plaintiff indicated that future purchases would be billed to Defendant, "c/o Medomak Canning Co., P.O. Box 4566, Portland, Maine, 04101" and charac-

---

**1.** At the close of Plaintiff's case, Plaintiff offered into evidence the transcripts of the depositions of George Lewis and Bernard Lewis, both of which the Court admitted into evidence. Consequently, the Court is free to consider the offered depositions for both impeachment and substantive purposes.

terized the invoices that would be generated by these purchases as "Poultry Processing invoices." Ms. Young did not, however, send a copy of this letter to George Lewis at Poultry Processing. Nonparty Medomak also summarized its understanding of the agreement in a letter dated May 31, 1985 from Bernard Lewis to H. Stanfield of Plaintiff. Medomak indicated that its contract with Plaintiff was to be assigned to Defendant beginning May 30, 1985, with the invoices billed to Defendant, "c/o Medomak Canning Company, P O Box 4566, Portland ME 04112." Defendant, through George Lewis, denies having received a copy of Bernard Lewis's letter. The Court is unpersuaded by this denial in light of both Bernard Lewis's deposition testimony that he hand-delivered the letter to his father and George Lewis's general inability to recall the documents pertinent to this case. On June 17, 1985, David Lewis, president of Defendant, signed a letter to Plaintiff "evidenc[ing] the acceptance of Poultry Processing,Inc. [sic] of the assignment of the can supply contract between Continental Can and Medomak Canning Company." The letter characterized the assignment as an assignment of all obligations under the contract and not merely an assignment of the duty to pay for goods shipped under the contract after May 29, 1985. George Lewis instructed Defendant's president not to mail this letter because it did not represent the agreement he had made. By June 17th, the date of Defendant's unmailed letter, Plaintiff had shipped $61,350.81 worth of cans to Medomak, representing 45% of the total shipments currently at issue; by June 30th, Plaintiff had shipped $131,449.74 worth of cans to Medomak, or 96% of the total. These shipments were billed to Defendant in care of Medomak.

In mid-July, when the bills were almost past due, Plaintiff wrote directly to Defendant requesting that payment be made timely in accordance with the terms of the contract. The letter included a statement of the charges. The following month Plaintiff again requested payment directly from Defendant. This letter included copies of the invoices and requested that Defendant send payment to Linda Young. There is no dispute that Defendant never initiated contact with Plaintiff in response to these requests. At some point during July, Defendant did meet with Plaintiff's representative, Michael Anderson. At this meeting, Defendant reaffirmed that it had promised to pay the invoices for the May 30–July shipments but disavowed an assignment of the entire contract because Defendant did not wish to be liable for Medomak's debt to Plaintiff for goods received under the contract prior to May 30th. On July 26, 1985, Defendant paid Medomak $150,000, which Defendant has alleged was in full payment of Plaintiff's invoices.

In September 1985, Defendant took control of Medomak through a foreclosure action. After this date, Plaintiff and Defendant have worked on a cash-in-advance basis. Defendant no longer disputes its liability to pay Plaintiff for both the adjustments and service charges due on the shipments of cans it ordered and received once it took control of Medomak. Medomak is currently in bankruptcy proceedings, in which Defendant has filed a proof of claim that includes a $150,000 unsecured loan to Medomak on July 26, 1985.

## II. Conclusions of Law

The contract between Plaintiff and Medomak is clearly an exclusive requirements contract between merchants for the sale of goods. As such it is governed by the Maine version of the Uniform Commercial Code (U.C.C.), 11 M.R.S.A. § 2–101, et seq. (1964 & Supp.1986). When Medomak's debt under the contract exceeded its credit limit, Plaintiff properly requested adequate assurances of performance, id. § 2–609, which Medomak itself was unable to provide. As a method of providing assurance, Medomak offered to assign the contract to Defendant; Plaintiff assented to this assignment.

Contracts controlled by Article Two of the U.C.C. can be assigned. Id. § 2–210. In this case, both Medomak, the assignor,

and Defendant, the assignee, have characterized the agreement between Plaintiff and Defendant as an assignment of "the contract." This phrase is a term of art that connotes both the assignment of the contractual rights and a delegation of the contractual duties of the assignor. *Id.* § 2–210(4). The Court finds that both entities used this term of art because they intended to delegate the duty to pay to Defendant. In order to obligate Defendant to assume this duty, Defendant must accept. If Defendant did accept, Plaintiff has standing to enforce Defendant's promise to pay because Plaintiff is a party to the original contract. *Id.*

### A. *Statute of Frauds*

■ Defendant accepted an assignment of the contract, at least to the extent of the delegation of Medomak's duty to pay for future shipments, by the parol promise of George Lewis at the May 29th meeting with Plaintiff. Defendant reaffirmed this acceptance both in a subsequent meeting with Plaintiff, in the deposition of George Lewis, and in the trial testimony of George Lewis. Defendant now raises the statute of frauds as a defense and claims that it is not obligated to Plaintiff because there is no writing signed by Defendant that evidences its acceptance of the assignment of the contract. Defendant's claim misconstrues the purpose of the statute of frauds.

A statute of frauds is designed to prevent fraud and perjury. Thus, the general rule under such statutes is that the courts will not enforce certain contracts unless there is some writing evidencing the existence of the contract signed by the party to be charged. A defendant may, however, waive the protection of the statute and be bound by verbal evidence of the contract. *Dehahn v. Innes*, 356 A.2d 711, 717–18 (Me.1976) (*citing Bird v. Munroe*, 66 Me. 337 (1877)). Under the U.C.C. statute of frauds, one who "admits in his pleading, testimony or otherwise in court" that a contract was made waives the protection of the statute to the extent of the quantity admitted. 11 M.R.S.A. § 2–201(3)(b).[2] The Maine Law Court has specifically analyzed the intent of the Maine Legislature in enacting this portion of the U.C.C.:

By this change in the statute of frauds, the Legislature had in mind to expand the exceptions to the statutory rule of nonenforceability concerning oral agreements relating to the sale of goods. Although limited in scope, this provision of the Code was intended to deny the benefit of the statute of frauds to one who in court, whether by pleading, testimony or otherwise, admits the existence

---

**2.** Maine's U.C.C. statute of frauds provides:

Formal requirements: statute of frauds

(1) Except as otherwise provided in this section, a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in such writing.

(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within 10 days after it is received.

(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

(a) If the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or

(b) If the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

(c) With respect to goods for which payment has been made and accepted or which have been received and accepted (section 2–206).

11 M.R.S.A. § 2–201 (1964).

of the oral contract sued upon. The ultimate design of this legislation is to limit the use of the statute of frauds as a shield against unfounded fraudulent claims resting in parol, while removing from the arsenal of an unscrupulous litigant an unrighteous defense against a just claim.

*Dehahn*, 356 A.2d at 717 (citation omitted). Defendant has admitted the existence of an agreement; it cannot now raise the statute of frauds as a defense.

Defendant argues that the U.C.C. statute of frauds does not apply unless the Court finds that Plaintiff and Defendant entered a separate contract for the sale of goods. In the absence of the existence of such a separate contract, Defendant contends that the statute of frauds found in 33 M.R.S.A. § 51 (1978), which does not contain an exception for admissions to the Court, applies to the agreement between the parties. It is clear that section 2–201 applies to only "a contract for the sale of goods." § 2–201(1); *see also* § 2–201(3)(b). Article Two itself applies to all "transactions in goods," except those specifically excepted. § 2–102. Therefore, the specific language in section 2–201 appears to reflect an intention by the drafters to give the Article Two statute of frauds a more narrow application than the rest of the Article. The question for the Court, therefore, is whether an assignment is a "contract for sale" within the meaning of section 2–201(3)(b).

The Court notes that Article Two clearly applies to assignments of contracts for sale. § 2–210 & comments. Generally, an assignment "is not a contract because it involves an executed transaction." J. Calamari & J. Perillo, *The Law of Contracts* § 18–3, at 633 (2d ed. 1977). Nevertheless, an assignment that includes a delegation of duties affects the parties to the contract insofar as the assignee who accepts the delegation is liable directly to the other party of the original contract. The practical effect of such an assignment is to make the assignee the buyer or the seller under the original contract. The Code explicitly provides that acceptance of a delegation "constitutes a promise by [the assignee] to perform." § 2–210(4). This promise brings the assignee within the terms of the original contract.

Neither Plaintiff nor Defendant has provided the Court with any case that illuminates this question, nor has the Court discovered one through its own research. The Court does note that, in other contexts, courts have reached widely varying conclusions regarding the applicability of the U.C.C. statute of frauds to agreements, other than contracts for sale, involving goods. *See Lorenz Supply Co. v. American Standard, Inc.*, 419 Mich. 610, 624–32, 358 N.W.2d 845, 851–54 (1984) (Brickley, J., concurring) (summarizing cases that have considered whether distributorship agreements are contracts for sale within the U.C.C. statute of frauds and finding that the majority view is to bring these agreements within section 2–201).

The Court looks for guidance to the policies expressed by the Maine Law Court in its prior interpretations of the scope of Article Two. In *Zamore v. Whitten*, 395 A.2d 435 (Me.1978), the Law Court expressed its willingness to apply Article Two by analogy to transactions not expressly within the Article's provisions. *Id.* at 442–43. After considering the equitable purposes of section 2–201, the relationship of all the parties in an assignment of a contract for the sale of goods, and the strong sentiments expressed by the Law Court in *Dehahn* regarding the effect of section 2–201, this Court is confident that if the Law Court were faced with this case, it would agree that Defendant's admission that it entered into an agreement with Plaintiff precludes Defendant from relying on any statute of frauds. Therefore, without deciding whether assignments fall within the requirements of section 2–201, the Court finds that the purpose of any statute of frauds is satisfied by Defendant's admission. *See Faw v. Greenwood*, 101 Idaho 387, 390, 613 P.2d 1338, 1341 (1980) (applying similar reasoning to a consignment arrangement between the parties).

## B. Terms of the Agreement

Having found that Defendant entered into an agreement with Plaintiff, to be effective after the May 29th meeting, the Court turns to an analysis of the terms and nature of this agreement. Under the Code, Defendant's admission serves only to remove the bar of the statute of frauds; it does not establish the terms of the contract. *See generally* J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 2–3, at 55 (2d ed. 1980); *see also Thompson Printing Machinery Co. v. B.F. Goodrich Co.,* 714 F.2d 744, 746 (7th Cir.1983) (merchants exception to the U.C.C. statute of frauds takes away the statutory defense; "sender [of written confirmation] must still persuade the trier of fact that a contract was in fact made orally"); *but see Cives Corp. v. Callier Steel Pipe & Tube, Inc.,* 482 A.2d 852, 856–57 (Me.1984) (relying on document satisfying section 2–201 to establish a term of the contract).

The Code is explicit regarding the extent to which Defendant's admission may be used to enforce the contract: "the contract is not enforceable under this provision beyond the quantity of goods admitted." 11 M.R.S.A. § 2–201(3)(b). Some courts have extended this statutory language to include any terms about which the parties disagree. *Allen v. Harris Truck & Trailer Sales, Inc.,* 490 F.Supp. 488 (E.D.Mo.1980) (refusing to allow testimony regarding price where parties admitted contract but disputed terms thereunder); *Barton v. Tra-Mo, Inc.,* 73 Or.App. 804, 699 P.2d 1182 (1985) (refusing to remand to allow trial court to consider oral evidence of a requirements contract where party to be charged admitted contract for goods delivered but denied contract for future requirements). Other courts have found that once the contract itself is admitted, parol evidence may be used to prove the terms of the contract. *Giant Peanut Co. v. Carolina Chemicals, Inc.,* 129 Ga.App. 718, 720, 200 S.E.2d 918, 920 (1973); *Packwood Elevator Co. v. Heisdorffer,* 260 N.W.2d 543, 545–47 (Iowa 1977) (relying in part on the policy of the Code as expressed by *Dehahn v. Innes,* 356 A.2d 711 (Me.1976)); *Dangerfield v. Markel,* 252 N.W.2d 184, 189–90 (N.D.1977).

The Court finds that the better practice is to allow the Code to act as a shield according to its terms but to remove its protection as a defense where its terms do not require its application. Therefore, the Court must accept Defendant's admission regarding the quantity term of the agreement as the conclusive proof of that term. The Court may, however, consider parol evidence regarding the other terms of the contract.

■ Turning first to the quantity term, the Court finds that Defendant promised to pay for those cans necessary for the canning season then underway. This promise reflects a quantity as determined by Medomak's requirements. A quantity term expressed in terms of a requirements contract means actual requirements that occur in good faith. This quantity term is definite enough to be enforced under the Code unless the requirements are "unreasonably disproportionate" to either stated estimates or prior or normal output. 11 M.R.S.A. § 2–306. Defendant has not contested the quantity of cans for which Plaintiff alleges it is liable. Consequently, the Court finds it may enforce Defendant's promise to pay for the May 30th to July, 1985 shipments of cans from Plaintiff to Medomak in the quantity reflected on the invoices. Similarly, Defendant does not dispute the price or billing terms included in the invoices, and the Court may also enforce the promise to pay according to these prices and terms.

■ Defendant does contend, however, that its agreement with Plaintiff cannot be enforced because Plaintiff breached the agreement by mailing the invoices to Defendant in care of Medomak instead of to Defendant directly. The Court is unpersuaded that this variance is a breach of the agreement. The testimony of George Lewis is quite clear regarding the terms of his agreement: he agreed to assume the duty to pay but left any arrangements to Bernard Lewis. Since George Lewis did not negotiate any particular terms, the Court

**576**

views the mailing address of the invoices as an additional term. Section 2–207 controls the significance of these additional terms. This additional term appeared in the confirmation letters of both Plaintiff and Medomak. Defendant first became aware of this term when it received a copy of Medomak's May 31st letter. It also received copies of invoices that were originally mailed to Defendant in care of Medomak. The Code provides that, among merchants, additional terms become incorporated into an existing contract unless notice of objection is given within a reasonable time or unless the additional terms materially alter the contract. 11 M.R.S.A. § 2–207;[3] *Redlon's Inc. v. Gilman, Inc.,* 485 A.2d 661 (Me.1984). Plaintiff, Defendant, and Medomak are clearly merchants within the meaning of the Code.[4] *Cives Corp.,* 482 A.2d at 857. There is no evidence before the Court that this additional term materially altered the agreement. Moreover, at no time did Defendant object to the mailing address. Consequently, Defendant cannot come forward for the first time in this Court and contend that it conditioned its payment to Plaintiff on Plaintiff's mailing the invoices directly to Defendant.

■ Although Defendant has repeatedly admitted that it entered into an agreement with Plaintiff, Defendant has denied that it agreed to an assignment of the contract. As this Court has previously noted, "[n]o

Maine case succinctly sets forth the requisites of a valid assignment." *Shiro v. Drew,* 174 F.Supp. 495, 497 (D.Me.1959) (applying Maine law) (per Gignoux, J.). The Court notes that partial assignments have long been held to be valid in Maine. *See Gentle v. Lamb-Weston, Inc.,* 302 F.Supp. 161, 163 n. 4 (D.Me.1969) (per Gignoux, J.). In addition, Maine has long recognized the validity of an oral promise to pay for goods ordered by and shipped to a third-party where the seller relies on the credit-worthiness of the promisor. *Hines & Smith Co. v. Green,* 121 Me. 478, 118 A. 296 (1922). Nothing in the enactment of the U.C.C. apparently changes the validity of this precedent. Defendant's parol promise to pay for the cans necessary for the canning season then underway effected a partial delegation of the contract between Plaintiff and Medomak with regard to the duty to pay for Medomak's requirements of cans. Defendant owed this duty directly to Plaintiff. Therefore, Defendant's payment to Medomak did not discharge its duty to Plaintiff. Consequently, the Court finds that Defendant is liable to Plaintiff for the amounts due for the May 30–July 1985 shipments of cans and for the services charges that have accrued under the contract for these overdue amounts.

In view of the above findings of facts and conclusions of law, it is ORDERED that judgment in the amount One Hundred

**3.** The provision provides:
Additional terms in acceptance or confirmation
   (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
   (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
   (a) The offer expressly limits acceptance to the terms of the offer;
   (b) They materially alter it; or
   (c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

   (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Title. 11 M.R.S.A. § 2–207 (1964).

**4.** Defendant asserted at trial that there was insufficient evidence to establish that it was a merchant within the meaning of 11 M.R.S.A. § 2–104(3) (1964). The Court finds no basis for this assertion. Defendant's letters to Plaintiff of September 24 and October 4, 1985, which were admitted into evidence, establish that Defendant possessed "the knowledge or skills of merchants." *Id.*

Forty-Seven Thousand Four Hundred Sixty-Five Dollars and Nine Cents ($147,-465.09) be entered for Plaintiff, Continental Can Co., Inc. This judgment includes:

(1) $137,584.89    for goods shipped May 30–July 1985

(2) $ 3,304.60    for adjustments to September 1985 orders

(3) $ 6,575.60    for service charges through February 6, 1986, consisting of monthly charges of:

     (a) $ 517.76
     (b) 1,147.48
     (c) 1,200.80
     (d) 1,209.64
     (e) 1,249.96
     (f) 1,249.96

So ORDERED.