**ROTH STEEL PRODUCTS, and Toledo Steel Tube Company, Plaintiffs-Appellees, Cross-Appellants,**

v.

**SHARON STEEL CORPORATION, Defendant-Appellant, Cross-Appellee.**

Nos. 80–3702, 80–3748.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 5, 1982.

Decided April 8, 1983.

Rehearing Denied June 1, 1983.

B. Casey Yim/L.E. Oliphant, Jr., Squire, Sanders & Dempsey, James M. Porter (argued), Jones, Day, Reavis & Pogue, Joseph G. Berick, R. Jeffery Pollock, Burke, Haber & Berick, Cleveland, Ohio, for defendant-appellant, cross-appellee.

Sheldon Berns (argued), Michael H. Diamant, Kahn, Kleinman, Yanowitz & Arnson, Cleveland, Ohio, for plaintiffs-appellees, cross-appellants.

Before MERRITT and KEITH, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

CELEBREZZE, Senior Circuit Judge.

This diversity action for breach of contract involves issues which require us to explore some relatively uncharted areas of Article Two of the Uniform Commercial Code, Ohio Rev.Code Sec. 1302.01 *et seq.* We vacate the district court's judgment, however, to the extent that it concludes that adequate notice of breach was given in 1974 and remand this question for more comprehensive findings of fact.

### I.

The plaintiffs-appellees (cross-appellants), Roth Steel Products Company and Toledo Steel Tube Company, are subsidiaries of Roth Industries, Inc. Roth Steel produces welded straight tubing for a variety of uses; Toledo Steel Tube produces fabricated steel tubing for use in automobile exhaust systems. Mr. Howard Guerin, vice-president for purchasing, Roth Industries, served as the purchasing agent for both corporations until April, 1973, when he was replaced by Mr. Richard Mecaskey.

Sharon Steel Corporation, defendant-appellant (cross-appellee), is a subsidiary of NVF Corporation. In 1973, Sharon was an integrated steel producer which accounted for approximately one percent of the steel produced in this country. It produced hot rolled and cold rolled sheet steel in carbon and alloy grades, as well as pickled and oiled sheet steel. The plaintiffs used sheet steel to produce tubing. Mr. Frank Metzger, Sharon's Northern Ohio Sales Manager, was responsible for all sales to the plaintiffs.

A. In 1972, the steel industry operated at approximately 70% of its capacity. Steel prices were highly competitive and discounts from published prices were given customers in an effort to increase the productive use of steel making capacity. On November 14, 1972, Metzger, Sharon's representative, met with Guerin[1] and offered to sell the plaintiffs specific quantities of hot rolled, cold rolled and pickled steel at prices substantially lower than Sharon's "book price".[2] Testimony indicated that these prices and quantities were to be effective from January 1 until December 31, 1973.

On November 17, 1972, Metzger forwarded a communication in the form of a letter to Guerin confirming the discussions of November 14.[3] The letter indicated that Shar-

1. Prior to late 1972, the plaintiffs had purchased steel on the open market primarily from sources other than Sharon. The November meeting was for the apparent purpose of creating a long-term, buyer-seller relationship between Sharon and the plaintiffs.

2. "Book prices" are the published prices generally offered by each steel mill for their products. These prices, which were published in *Iron Age* magazine, vary according to the type of steel. Throughout 1973, the plaintiffs were charged prices which were less than the "book price" published by Sharon.

3. The letter written by Metzger on November 17, 1972 reads as follows:

Dear Sir:

Confirming our telephone conversation of today, we attach hereto our Rolling Range for Hot Rolled, Black and Pickled.

Prices are: Hot Rolled, Black, Mill Edge = $140.00 Ton and Hot Rolled, Pickled, Slit Edge = $148.00 Ton. Both are F.O.B., Sharon, Pennsylvania and are guaranteed for cal-

endar 1973. We have set aside for you 200 tons per month of Hot Rolled, Pickled, starting with December, 1972. Hot Rolled Black, is on open schedule basis. Usual delivery is about three to four weeks.

In our conversation at Sharon on November 14, 1972, we discussed the probability of 500 tons per month of Cold Rolled Sheet for Cleveland and the same for Toledo.

Prices on this product $165.00 Ton for Commercial Quality, Matte Finish, and for Commercial Quality, Commercial Brite $170.00 Ton. Both are F.O.B., Sharon, Pennsylvania. These prices are subject to increase to the extent of any general price increase granted the steel industry.

In all cases, quality extras are in addition to the above prices.

Yours very truly.
SHARON STEEL CORPORATION
/s/ Frank Metzger
F.W. Metzger
District Manager

on would sell the plaintiffs 200 tons of hot rolled pickled steel each month for $148.00 per ton and that it would sell plaintiffs hot rolled black steel on a open schedule basis for $140.00 per ton. The letter also discussed "the probability" that Sharon could sell 500 tons of cold rolled to both Roth Steel and Toledo at varying prices depending on the type of cold rolled steel ordered. Metzger testified that a few days after the letter was sent, the plaintiffs agreed to purchase 1,000 tons of cold rolled steel (500 tons each) at the prices indicated in the letter.

On February 15, 1973, Metzger and Guerin met to discuss the tonnages of hot rolled steel mentioned in the November 17 letter. During the meeting, Metzger and Guerin agreed to increase the monthly tonnage of hot rolled pickled steel that Sharon would sell to the plaintiffs from 200 tons to 300 tons each month. Metzger also agreed, on behalf of Sharon, to sell the plaintiffs 300 tons of hot rolled black steel until May, 1973, when the monthly tonnage would be increased to 400 tons per month for the remainder of 1973. To confirm the agreement, Metzger noted these increased tonnages on Guerin's copy of the November 17 letter.

In early 1973, several factors influenced the market for steel. Federal price controls[4] discouraged foreign producers from importing steel; conversely, domestic producers exported a substantial portion of the steel produced domestically, in an effort to avoid federal price controls. Thus, the domestic steel supply was sharply reduced. In addition, the industry experienced substantial increases in demand as well as increases in labor, raw material, and energy costs. These increased labor, raw material, and energy costs compelled steel producers to increase prices. The increased demand and the attractive export market caused the entire industry to operate at full capacity in 1973 and 1974. Consequently, nearly every domestic producer experienced substantial delays in delivery.

As a result of the changed market conditions, Sharon decided to withdraw all price concessions, including those it had given the plaintiffs. The plaintiffs were notified of this decision on March 23, 1973 and they immediately protested, asserting that the price increase was a breach of the November, 1972 agreement, as modified in February. As a result of this protest, discussions ensued and Sharon agreed to continue to sell steel to the plaintiffs at the discount prices of November, 1972 until June 30, 1973. For the remainder of 1973, Sharon proposed to sell rolled steel to plaintiffs at modified prices; these prices were higher than the prices set forth in the November 17 letter, but were lower than the published prices which Sharon charged its other customers. Sharon clearly indicated to plaintiffs that Sharon would sell no steel to plaintiffs after June 30, 1973 except at modified prices. Although plaintiffs initially were reluctant to accept Sharon's compromise, they finally agreed to Sharon's compromise proposal primarily because they were unable to purchase sufficient steel elsewhere to meet their production requirements.[5]

In the second half of 1973, Sharon also experienced difficulties in filling orders in a timely fashion. In most of 1973 and 1974, Sharon's mill was operating at full capacity; because it could not produce any more steel, Sharon implemented a "blanking" policy in an effort to reduce the backlog of orders. Pursuant to the blanking policy, Sharon would refuse to accept purchase orders that requested delivery for a particular "blanked" month and all the steel produced that month was used to fill overdue orders. Because of this policy Sharon refused sever-

4. *See* note 21, *infra.*

5. In June, 1973, Sharon was supplying nearly one-third of plaintiffs' steel requirements. Because nearly all of the mills were operating at full capacity and because all of the mills were fully booked, plaintiffs could not purchase the large amount of steel needed to replace Sharon's quantities.

al purchase orders issued by plaintiffs: it refused to book Roth's orders of 300 tons of hot rolled pickled steel and 400 tons of hot rolled black steel for delivery in October, 1973 and Toledo's order of 425 tons of cold rolled steel for delivery in December, 1973. Both October and December were "blanked" months.

B. Sharon and the plaintiffs conducted business differently in 1974. In 1974, contracts were formed separately on an order-by-order basis. Normally, the plaintiffs issued a purchase order which indicated the type and amount of steel sought, and the requested delivery date; the purchase orders were offers to purchase steel and were not effective until accepted by Sharon. Sharon accepted an offer by issuing an acknowledgment form; in this form, Sharon agreed to ship a quantity of steel by a specific date, usually the date requested by the purchaser. The acknowledgment form indicated that the price for the shipment would be the "[s]eller's prices prevailing at the time of shipment."

In 1974, the steel market became even less predictable than in 1973: overall demand increased, deliveries of steel became more erratic, and acknowledged delivery dates were rarely observed. Sharon's actual delivery dates were three to five months after the promised delivery dates. Throughout 1974, the price of steel steadily rose; as a consequence, Sharon's late deliveries had the effect of increasing the price of the goods.

Although Sharon's shipments to the plaintiffs were consistently delinquent throughout 1974, the plaintiffs continued to accept the late shipments and to place new orders with Sharon. The plaintiffs apparently acquiesced in this pattern of late shipments and higher prices for two reasons:

they had no practical alternative source of steel and they believed Sharon's assurances that the late deliveries resulted from the general shortage of raw materials and the need to equitably allocate its limited production among all of its customers.

In May, 1974, the plaintiffs discovered facts that caused them to believe that the delays in shipment were not entirely the result of raw material shortages and Sharon's allocation system. Specifically, the plaintiffs learned on May 9, 1974, that Sharon was selling substantial amounts of rolled steel to its subsidiary Ohio Metal Processing Company. Ohio Metal Processing was operating as a warehouse[6] and selling steel at premium prices. By selling through its warehouse-subsidiary, Sharon was able to obtain higher prices than federal price controls otherwise permitted. In 1974, approximately fifteen percent (20,000 tons per month) of Sharon's monthly steel production was sold to Ohio Metal Processing. Thus, the plaintiffs assert that they first learned that Sharon's late deliveries were not entirely the result of raw material shortages and an allocation system when they learned that steel was being sold to Ohio Metal Processing.

The plaintiffs did not immediately act upon this information. Instead, they allowed the remaining unfilled orders to pend during the summer. In September, 1974, Roth's orders were placed on "hold" due to the labor dispute. Most of plaintiffs' orders were cancelled October, 1974. One final delivery was made by Sharon on October 31, 1974; although this order had been inadvertently overlooked by the plaintiffs and thus not cancelled, the plaintiffs rejected this shipment because delivery had been made nearly one year after the agreed delivery date.[7]

---

**6.** Steel warehouses maintain inventories of rolled steel and can generally fill orders more quickly than mills. Although some warehouses can process steel, many, including Ohio Metal Processing, merely purchase steel from the mills and hold it for resale. Because of this, warehouse prices are uniformly higher than mill prices for the same type of steel.

Sharon's chief operating officer, Mr. Guy F. McCracken, testified that Sharon set up Ohio Metal Processing as a subsidiary in an effort to circumvent federal price controls because warehouse prices were not subject to price controls.

**7.** Roth's purchase order No. 8391 and Toledo's purchase order No. 002957 were issued on May 7, 1973 and May 5, 1973 respectively. Order

C. The plaintiffs commenced this action in April, 1975, alleging breach of contract and seeking to recover their expenses in "covering". In March, 1976, the plaintiffs sought leave to file an amended complaint. The complaint, as amended, asserted 41 counts; plaintiffs sought damages based on the difference between the contract price and the market price for the goods at the time breach was discovered. The amended complaint sought total damages of $896,-174.60. Sharon's answer denied the existence of a contract for the calendar year 1973 and raised several defenses: the statute of frauds, modification of the oral contract, commercial impracticability and failure to give notice of breach. It also counterclaimed for damages based upon the steel shipment which was rejected by Toledo Steel in October, 1974.

Following discovery, the district court granted plaintiffs' motion for partial summary judgment, concluding that the statute of frauds did not bar the enforcement of the November, 1972 oral agreement. Following a five day trial, the district court issued a lengthy and exhaustive memorandum of opinion. In the opinion, the district court concluded that an oral contract was formed in November, 1972; that Sharon's attempt, in June, 1972, to modify the contract was ineffective; and that Sharon had breached the contract by charging prices higher than agreed upon in the November, 1972 contract, by refusing to sell steel in October and December, 1973, and by failing to make timely delivery of some orders issued pursuant to the 1972 agreement. With regard to the 1974 transactions, the district court concluded that Sharon had breached several contracts for delivery of steel by failing to make a timely delivery or by failing to make delivery at all. It also concluded that the plaintiffs had given adequate notice of breach with regard to those late shipments which they accepted. It granted the plaintiffs damages of $555,-968.46, but denied their motion for prejudgment interest. Finally, it dismissed Sharon's counterclaim, because it concluded that Toledo properly rejected the late shipment.[8]

Sharon has appealed from the district court's order granting the plaintiffs claim for damages and the order dismissing its counterclaim. The plaintiffs have cross-appealed from the district court's order denying prejudgment interest.[9]

## II.

A. The threshold question is whether an oral contract for the sale of goods in excess of five hundred dollars which cannot be performed within one year is subject to the requirements of both O.R.C. Sec. 1302.04 (U.C.C. Sec. 2–201) and O.R.C. Sec. 1335.-05.[10] The district court, in response to

No. 8391 was partially filled, but at the time of cancellation, nearly 333 tons was undelivered. Order No. 002957 was also partially filled, but 40 tons remained delinquent until October 1, 1974 when it was delivered by Sharon and rejected by Toledo. Although these orders were issued pursuant to the fixed-price contract, they will be discussed along with the 1974 non-deliveries, because breach was not discovered until 1974. *See* note 52, *supra.*

**8.** Sharon has consistently refused to take possession of the rejected shipment because it believes the rejection to be wrongful. Because it has not taken possession and resold the steel, it seeks the full invoice price in the counterclaim.

**9.** The plaintiffs have cross-appealed, seeking review of the district court's order denying the plaintiffs' motion from pre-judgment interest. We affirm. Ohio law permits pre-judgment interest for an unliquidated claim only "where the amount of loss can be ascertained by 'mere computation or is subject to reasonably certain calculations by reference to existing market values'". *Royal Crown Plastics & Sales, Inc. v. Motorists Mutual Insurance Co.,* 51 Ohio App.2d 79, 366 N.E.2d 294, 295–96 (1976). In this case, the amount of compensable loss cannot be easily calculated. In fact, the amount of damages to be awarded remains unsettled after eight years of litigation.

**10.** The uniform commercial code's statute of frauds provision, O.R.C. Sec. 1302.04 (U.C.C. Sec. 2–201), states:

Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

cross-motions for partial summary judgment, concluded that O.R.C. Sec. 1302.04 (U.C.C. Sec. 2–201) must be viewed as an exception to the requirements of O.R.C. Sec. 1335.05, the general statute of frauds provision, and that the November 17, 1972 confirmation letter, coupled with certain admissions on the part of Frank Metzger, satisfied O.R.C. Sec. 1302.04 (U.C.C. Sec. 2–201). Because we believe that O.R.C. Sec. 1302.04 (U.C.C. Sec. 2–201) and O.R.C. Sec. 1335.05 present an irreconcilable conflict, we agree with the district court that only the uniform commercial code's statute of frauds is applicable.[11] We also believe that the admissions made by Frank Metzger satisfy the special requirements of O.R.C. Sec. 1302.04 (U.C.C. Sec. 2–201) and, thus, that the oral contract is enforceable.

The uniform commercial code is a comprehensive statutory scheme regulating commercial sales transactions. *See* O.R.C. Sec. 1301.04 (U.C.C. Sec. 1–104). As part of that scheme, O.R.C. Sec. 1302.04(C)(2) (U.C.C. Sec. 2–201(3)), provides that a contract for the sale of goods in excess of five hundred dollars need not be evidenced by a writing "if the party against whom enforcement is sought admits in his pleading, testi-

mony, or otherwise in court that a contract was made." O.R.C. Sec. 1335.05, however, contains no exception to its requirement that contracts which cannot be performed within one year must be in writing. Consequently, an irreconcilable conflict exists when a contract falls within the scope of both O.R.C. Sec. 1302.04 (U.C.C. Sec. 2–201) and O.R.C. Sec. 1335.05; not all contracts which are enforceable under O.R.C. Sec. 1302.04 satisfy the requirements of O.R.C. Sec. 1335.05.[12] Either the writing requirements of O.R.C. Sec. 1335.05 must be viewed as an exception to O.R.C. Sec. 1302.-04(C)(2) or O.R.C. Sec. 1302.04 (U.C.C. Sec. 2–201) must be interpreted as an exception to mandates of O.R.C. Sec. 1335.05.

■ Generally, when an irreconcilable conflict exists between a special statute and a general statute, the special statute prevails as an exception unless the legislature has expressly manifested a contract intent.[13] *E.g., State ex rel. Myers v. Chiaramonte,* 46 Ohio St.2d 230, 237, 348 N.E.2d 323, 328 (1976). O.R.C. Sec. 1302.04 (U.C.C. Sec. 2–201) is a special legislative attempt to tailor the statute of frauds to the unique characteristics of a commercial sales transaction.[14] Conversely, O.R.C. Sec. 1335.05, is

O.R.C. Sec. 1335.05, Ohio's general statute of frauds provision, provides, in part:

No action shall be brought whereby to charge the defendant ... upon an agreement that is not to be performed within one year from the making thereof; unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized.

**11.** *But see, Oskey Gasoline & Oil Co., Inc. v. Continental Oil,* 534 F.2d 1281 (8th Cir.1976) (applying the general statute of frauds where the two statutory provisions overlap).

**12.** Another sharp conflict between O.R.C. Sec. 1302.04 (U.C.C. Sec. 2–201) and O.R.C. Sec. 1335.05 regards the sufficiency of the writing requirement. The official comment following O.R.C. Sec. 1302.04 (U.C.C. Sec. 2–201) indicates that the writing is sufficient even if material terms of the contract are absent or misstated. In contrast, O.R.C. Sec. 1335.05 requires that the necessary writing include all material terms of the contract. *See Quarto Mining Co. v. Litman,* 42 Ohio St.2d 73, 326 N.E.2d 676 (1975) (memorandum must contain the essen-

tial terms of agreement expressed with such clarity that they are understandable without the aid of parol evidence); *O'Leary v. Burnett,* 56 OL Abs 343, 92 N.E.2d 407, 408 (1949).

**13.** This statutory rule of construction is codified at O.R.C. Sec. 1.51, which provides:

If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the manifest intent is that the general provision prevail.

Essentially, this statutory provision permits courts to infer a legislative intent to "modify" or "partially repeal" the general statutory provision from the existence of an irreconcilable conflict with a special statutory provision. *See State v. Ruppert,* 54 Ohio St.2d 263, 268, 375 N.E.2d 1250, 1254 (1978) (repeal by implication is primarily a question of legislative intent).

**14.** For example, O.R.C. Sec. 1302.04(B) provides that *between merchants* a failure to respond within a reasonable time to a written

the "general" statute of frauds provision encompassing a wide variety of contractual obligations which must be evidenced by a writing. Because of Ohio's policy of interpreting special statutes as exceptions to more general provisions, and because the transactions between plaintiffs and Sharon are squarely within the scope of Article 2 of the uniform commercial code, we believe that the November oral contract need only satisfy the requirements of O.R.C. Sec. 1302.04 (U.C.C. Sec. 2–201).

The district court held that the deposition testimony of Frank Metzger satisfied the judicial admission exception to the statute of frauds established by O.R.C. Sec. 1302.-04(C)(2) (U.C.C. Sec. 2–201(3)(b)).[15] The primary dispute on appeal concerns the *scope* of a representative admission under O.R.C. Sec. 1302.04(C)(2) (U.C.C. Sec. 2–201(3)(b)).[16] The question is whether agents with authority to contract on behalf of their principals[17] can make an admission which satisfies O.R.C. Sec. 1302.04(C)(2) (U.C.C. Sec. 2–201(3)(b)).

The uniform commercial code should be liberally construed and ought to be applied to promote its underlying purposes, O.R.C. Sec. 1301.02 (U.C.C. Sec. 1–102). The primary purpose of the statute of frauds is to protect parties from *unfounded* parol asser-tions of contractual obligation. *See e.g., Dehahn v. Innes,* 356 A.2d 711, 717 (Me. 1978). Before the judicial admission section was enacted, parties enjoyed the protection afforded by the statute of frauds even though they admitted the existence of a contract in their pleadings or in their testimony. The judicial admission exception to the statute of frauds represents a specific legislative response to this anomaly: no longer may a party admit the existence of a contract, or facts which may establish existence of a contract, and simultaneously claim the benefits of the statute of frauds. *E.g., Dehahn v. Innes,* 356 A.2d 711 (Me.1978) (the enactment of the judicial admission exception to the statute of frauds was designed to prevent unscrupulous litigants from using the statute of frauds in a manner inconsistent with its intended purpose); *Packwood Elevator Company v. Heisdorf-fer,* 260 N.W.2d 543 (Iowa 1977). The question whether a representative admission by an agent with authority to bind his principal satisfies the judicial admission exception to the uniform commercial code's statute of frauds provision, therefore, must be analyzed in light of these policy considerations.

The judicial admission exception to the statute of frauds is based on the

confirmation of the contract may satisfy the uniform commercial code's statute of frauds provision. Moreover, O.R.C. Sec. 1302.04 contains special provisions concerning specially manufactured goods and goods for which payment has been made and accepted. These terms are unique to the commercial sales field and a determination of rights often require referring to related uniform commercial code provisions. *See* O.R.C. Sec. 1302.64 (what constitutes acceptance of goods).

**15.** The judicial admission exception, O.R.C. Sec. 1302.04(C)(2) (U.C.C. Sec. 2–201(3)(b)), provides:

(c) A contract which does not satisfy the requirements of division (A) of this section [writing requirements] but which is valid in other respects is enforceable;

(2) If the party against whom enforcement is sought admits in his pleading, testimony, or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted . . . .

**16.** Sharon also challenges the district court's conclusion that admissions in filed depositions may satisfy the statutory requirements for the judicial admission exception to the statute of frauds. The judicial admission provision applies when a party admits the existence of a contract by "pleading, testimony, or otherwise in court." O.R.C. Sec. 1302.04(C)(2) (U.C.C. Sec. 2–201(3)(b)). This statutory language contemplates additional admissions beyond those which occur in pleadings and in-court testimony. We can discern no reason for permitting court admissions, but not deposition admissions, to satisfy Sec. 1302.04(C)(2). Consequently, we hold that admissions contained in depositions on file with the court are within the meaning of "otherwise in court." *See e.g., Oskey Gasoline & Oil, Inc. v. Continental Oil,* 534 F.2d 1281, 1284 (8th Cir.1976).

**17.** Neither party asserts that Metzger was without authority to contract on behalf of Sharon. Consequently, we assume that Metzger had actual authority to bind Sharon to the November, 1972 oral contract.

maxim that principals rarely act in a manner inconsistent with their own interests. The statute, therefore, assumes that a principal's admission regarding the existence of a contract is certain to be well founded. We believe that an admission by an agent with authority to bind his principal to the disputed contract is equally reliable. Agents owe a duty to their principals to act in a manner consistent with the principal's interests. Moreover, the agent's interest in continued employment assures that the agent will act in the principal's best interest. In short, both the principal and his agent have an identity of interest in protecting the principal from unfounded oral assertions of obligation. Because the principal retains the ability to choose the individuals able to contract on his behalf, an interpretation which recognizes as admissions those statements made by agents with authority to contract does not unduly burden the principal's interest in being protected from unwarranted assertions of contractual obligation. For these reasons we hold that agents with authority to bind their principals to the disputed contract may admit the existence of an oral contract for the purposes of O.R.C. Sec. 1302.04(C)(2) (U.C.C. Sec. 2–201(3)(b)), see Alter & Sons, Inc. v. United Engineers & Constructors, Inc., 366 F.Supp. 959, 966 (S.D.Ill.1973), and that the admissions by Metzger of the existence of a contract satisfied the requirements of O.R.C. Sec. 1302.04(C)(2) (U.C.C. Sec. 2–201(3)(b)).[18]

B. The district court found that during the November, 1972 negotiations between plaintiffs and Sharon, plaintiffs promised to purchase and Sharon promised to sell specific quantities of steel throughout the calendar year 1973. The existence and scope of promises made by the plaintiffs and Sharon during the November negotiations present factual questions wholly separate from the legal consequences which attach to such subsidiary findings. Although this Court may freely review the district court's legal conclusion concerning the existence of an enforceable oral contract, its subsidiary factual determinations must be upheld unless they are clearly erroneous.[19] Sufficient evidence supports the district court's findings regarding what the parties actually agreed upon. Moreover, we believe that the district court properly applied the controlling principles of law; thus, we hold that the November negotiations resulted in a contract, to be performed in 1973, for the sale of fixed quantities of steel.

The district court relied primarily upon the testimony of Frank Metzger, to support its finding that the November negotiations

---

18. Metzger, an adverse witness, was deposed by plaintiffs and testified as follows:

Q. Will you tell us what you do recall?
A. The only thing I can recall is that we agreed on a price and we talked about tons at that price.
Q. Do you recall any of the conversation that took place during that meeting?
A. Verbatim, no.

* * * * * *

Q. Now, in the third paragraph you say that, "In our conversation at Sharon on November 14, 1972, we discussed the probability of 500 tons per month of Cold Rolled sheet for Cleveland and the same for Toledo." Do you recall any conversation on November 14th regarding those facts?
A. That was the tonnage that Roth felt they could use, and we agreed to it.

* * * * * *

Q. When you check your records did you determine that the 500 tons would be available for shipment?
A. Yes.

Q. For a total of 1,000 tons of Cold Rolled?
A. Yes.
Q. And I take it that you conveyed that information to Howard Guerin [plaintiffs' purchasing agent].
A. Yes.
Q. Howard Guerin agreed that Roth could use that amount?
A. Yes.
Q. And that—
A. Those were the numbers we had discussed in Sharon

* * * * * *

19. Unlike an "ultimate question" of fact or mixed questions of fact and law, the district court's findings regarding what the parties actually promised each other does not require the application of legal principles. See, e.g., K & M Joint Venture v. Smith International, Inc., 669 F.2d 1106, 1111 (6th Cir.1982); Cordovan Associates, Inc. v. Dayton Rubber Co., 290 F.2d 858, 860 (6th Cir.1961).

resulted in an agreement concerning the issuance and acceptance of monthly purchase orders for specific tonnage of steel: two hundred tons per month of hot rolled pickled and oiled and five hundred ton per month of cold rolled steel. Metzger testified that on November 14, 1972, an agreement concerning the quantity and price of hot rolled pickled and oiled steel was reached between Guerin, and Sharon representatives and that the confirmation letter dated November 17, 1972 reflects the terms of that agreement.[20] Metzger's testimony and the terms of the November 17 letter indicate that the quantity of cold rolled steel was initially a tentative figure. Metzger admitted, however, that both parties agreed upon the proposed tonnage stated in the November 17 confirmation letter.[21] Although credible evidence exists which might support a different conclusion, we cannot conclude, in light of Metzger's testimony,

that the district court's subsidiary finding that plaintiffs promised to purchase and that Sharon promised to sell specific tonnages of steel is clearly erroneous.

■ Sharon argues that the November, 1972 agreement is unenforceable because the plaintiffs' promise to purchase specific quantities of steel from Sharon is illusory.[22] Sharon argues that it was not obligated to ship steel unless a purchase order was first issued and that the decision to issue a purchase order was wholly within the control of the plaintiffs. This argument assumes that the plaintiffs were obligated to buy steel only if they chose to issue a purchase order and that the plaintiffs were not obligated to issue purchase orders for a specific quantity of steel each month. The district court, however, found that the plaintiff's promise to buy a specific amount of steel per month was unconditional and concluded

20. See note 3, supra.

21. The district court relied on the November 17, 1972 confirmation letter as evidence of the 1973 contract terms. In addition to providing a variety of prices for steel, the November 17, 1972 letter contains a provision to the effect that prices for cold rolled steel are subject to increase to the extent of any "increase granted the industry." In the district court, Sharon argued that this clause permitted price modification to reflect any general increase in the market price for steel. Sharon cites a number of cases that stand for the proposition that a court cannot modify by implication clear and unambiguous terms of an express contract. See Alexander v. Buckeye Pipe Line Co., 53 Ohio St.2d 241, 374 N.E.2d 146 (1978); Rose v. The New York Life Ins. Co., 127 Ohio St. 265, 187 N.E. 859 (1933); Associated Truck Lines v. Baer, 346 Mich. 106, 77 N.W.2d 384 (1956). Because Sharon believes that the express terms of the November 17, 1972 letter are unambiguous, Sharon concludes that the district court was without discretion to vary the escalation clause.

The cases cited by Sharon do not apply. The November 17, 1972 confirmation letter does not contain the express terms of the November contract. Rather, the letter represents circumstantial evidence of the terms of the November contract. In other words, the "terms" included in the confirmation letter are not necessarily the terms of the oral agreement. Therefore, the district court in determining the terms of the oral contract was not limited to interpreting the precise language of the November 17, 1972

confirmation letter. Instead, the court properly considered all of the evidence adduced at trial.

As an aid to interpreting the clause, the district court took judicial notice that government price controls were in effect at the time of agreement, Executive Orders No. 11615, 11617, 12 U.S.C. Sec. 1904 (note); Economic Stabilization Act of 1970, Sec. 210, 12 U.S.C. Sec. 1904 (note) (repealed on April 30, 1974); and found that the parties intended to permit Sharon to raise the price of cold rolled steel to reflect any increase in government price controls. As a general rule of construction, courts give common words their ordinary meaning. See Alexander v. Buckeye Pipe Line Co., 53 Ohio St.2d 241, 246, 374 N.E.2d 146 (1978). In this regard, the district court focused on the phrase "increase granted the industry" contained in the November 17th confirmation letter, and determined that only the federal government could grant an increase to the steel industry. We hold that the district court's finding that the parties intended to allow an increase in the price of cold rolled steel to reflect any increase granted the industry by the federal government is not clearly erroneous.

22. Generally, an illusory promise is defined as a promise which according to its own terms makes the promisor's performance optional. E.g., Andreoli v. Brown, 35 Ohio App.2d 53, 299 N.E.2d 905 (1972). If the underlying contractual obligation is predicated on an illusory promise, the contract fails for want of mutual obligation. See, e.g., Mutual Home and Savings Ass'n v. Welker, 35 OL Abs. 566, 42 N.E.2d 167 (1941).

that the promise provided adequate consideration to support Sharon's promise to sell steel. We believe that this finding is not clearly erroneous and, therefore, that the plaintiff's promise to purchase steel is not illusory. *E.g., Davis Laundry & Cleaning Co. v. Whitmore,* 92 Ohio St. 44, 110 N.E. 518 (1915) (exchange of promises to buy and sell represents sufficient consideration).

C. In March, 1973, Sharon notified its customers that it intended to charge the maximum permissible price for all of its products; accordingly, all price concessions, including those made to the plaintiffs, were to be rescinded effective April 1, 1973. On March 23, 1973, Guerin indicated to Metzger that the plaintiffs considered the proposed price increase to be a breach of the November, 1972 contract. In an effort to resolve the dispute, Guerin met with representatives of Sharon on March 28, 1973 and asked Sharon to postpone any price increases until June or July, 1973. Several days later, Richard Mecaskey, Guerin's replacement, sent a letter to Sharon which indicated that the plaintiffs believed that the November, 1972 agreement was enforceable and that the plaintiffs were willing to negotiate a price modification if Sharon's cost increases warranted such an action. As a result of this letter, another meeting was held between Sharon and the plaintiffs. At this meeting, Walter Gregg, Sharon's vice-president and chairman of the board, agreed to continue charging the November, 1972 prices until June 30, 1973 and offered, for the remainder of 1972, to charge prices that were lower than Sharon's published prices but higher than the 1972 prices.[23] Although the plaintiffs initially rejected the terms offered by Sharon for the second half of 1973, Mecaskey reluctantly agreed to Sharon's terms on June 29, 1973.

Before the district court, Sharon asserted that it properly increased prices because the parties had modified the November, 1973 contract to reflect changed market conditions. The district court, however, made several findings which, it believed, indicated that Sharon did not seek a modification to avoid a loss on the contract. The district court also found that the plaintiffs' inventories of rolled steel were "alarmingly deficient" at the time modification was sought and that Sharon had threatened to cease selling steel to the plaintiffs in the second-half of 1973 unless the plaintiffs agreed to the modification. Because Sharon had used its position as the plaintiffs' chief supplier to extract the price modification, the district court concluded that Sharon had acted in bad faith by seeking to modify the contract. In the alternative, the court concluded that the modification agreement was voidable because it was extracted by means of economic duress; the tight steel market prevented the plaintiffs from obtaining steel elsewhere at an affordable price and, consequently, the plaintiffs were forced to agree to the modification in order to assure a continued supply of steel. *See e.g. Oskey Gasoline & Oil Co. v. Continental Oil Co.,* 534 F.2d 1281 (8th Cir.1976). Sharon challenges these conclusions on appeal.

■■■ The ability of a party to modify a contract which is subject to Article Two of the Uniform Commercial Code is broader than common law, primarily because the modification needs no consideration to be binding. O.R.C. Sec. 1302.12 (U.C.C. Sec. 2-209(1)). A party's ability to modify an agreement is limited only by Article Two's general obligation of good faith. *Ralston Purina Company v. McNabb,* 381 F.Supp. 181, 183 (W.D.Tenn.1974); Official Comment 2, O.R.C. Sec. 1302.12 (U.C.C. Sec. 2-209). *See* O.R.C. Sec. 1302.01(A)(2) (U.C.C. Sec. 2-103). *Erie County Water Authority v. Hen-Gar Construction Corp.,* 473 F.Supp. 1310, 1313 (W.D.N.Y.1979); *Ralston Purina Co. v. McNabb,* 381 F.Supp. at 182–83. In determining whether a particular modification was obtained in good

---

**23.** Under the compromise agreement, hot rolled sheets were to be shipped on converter basis, while cold rolled sheets (both Matte and Commercial Brite) were to be shipped on Class B basis. These two price classifications were not generally available to Sharon's purchasers. Both the converter base and the Class B base were "below book prices", that is, less than the published prices charged all of Sharon's other customers.

faith, a court must make two distinct inquiries: whether the party's conduct is consistent with "reasonable commercial standards of fair dealing in the trade," *U.S. for Use and Benefit of Crane Co. v. Progressive Enterprises,* 418 F.Supp. 662, 664 n. 1 (E.D. Va.1976), and whether the parties were in fact motivated to seek modification by an honest desire to compensate for commercial exigencies. *See Ralston Purina Co. v. McNabb,* 381 F.Supp. at 183 (subjective purpose [to maximize damages] of extending time of performance under contract indicates bad faith and renders modification invalid); O.R.C. Sec. 1302.01(A)(2) (U.C.C. Sec. 2–103). The first inquiry is relatively straightforward; the party asserting the modification must demonstrate that his decision to seek modification was the result of a factor, such as increased costs, which would cause an ordinary merchant to seek a modification of the contract. *See* Official Comment 2, O.R.C. Sec. 1302.12 (U.C.C. Sec. 2–209) (reasonable commercial standards may require objective reason); J. White & R. Summers, Handbook of Law under the U.C.C. at 41. The second inquiry, regarding the subjective honesty of the parties, is less clearly defined. Essentially, this inquiry requires the party asserting the modification to demonstrate that he was, in fact, motivated by a legitimate commercial reason and that such a reason is not offered merely as a pretext. *Ralston Purina Co. v. McNabb,* 381 F.Supp. at 183–84. Moreover, the trier of fact must determine whether the means used to obtain the modification are an impermissible attempt to obtain a modification by extortion or overreaching.[24]

*Erie County Water Authority v. Hen-Gar Construction,* 473 F.Supp. at 1313; Official Comment 2, O.R.C. Sec. 1302.12 (U.C.C. Sec. 2–209). *See* J. White and R. Summers, Handbook of the Law under the Uniform Commercial Code, at 40–41 (1972).

■ Sharon argues that its decision to seek a modification was consistent with reasonable commercial standards of fair dealing because market exigencies made further performance entail a substantial loss. The district court, however, made three findings which caused it to conclude that economic circumstances were not the reason that Sharon sought a modification: it found that Sharon was partially insulated from raw material price increases, that Sharon bargained for a contract with a slim profit margin and thus implicitly assumed the risk that performance might come to involve a loss, and that Sharon's overall profit in 1973 and its profit on the contract in the first quarter of 1973 were inconsistent with Sharon's position that the modification was sought to avoid a loss. Although all of these findings are marginally related to the question whether Sharon's conduct was consistent with reasonable commercial standards of fair dealing, we do not believe that they are sufficient to support a finding that Sharon did not observe reasonable commercial standards by seeking a modification. In our view, these findings do not support a conclusion that a reasonable merchant, in light of the circumstances, would not have sought a modification in order to avoid a loss.[25] For example, the district court's finding that Sharon's steel slab contract[26]

24. This question might be more properly analyzed under principles of procedural unconscionability. *See* J. White & R. Summers, Handbook of the Law under the U.C.C. at pp. 118–19. The parties did not brief the issue in this fashion, and the district court did not rule upon those grounds; consequently, we need not discuss the issue in this context.

25. We do not mean to imply that the desire to avoid a loss is the only permissible reason for seeking a modification of an existing agreement; we refer to this reason only because it is the primary justification offered in this instance.

26. Sharon was a party to a contract with United States Steel which allowed it to make monthly purchases of slab steel ranging from a minimum of 25,000 tons per month to a maximum of 45,000 tons per month. It was also a party to a contract with Wierton Steel which allowed it to purchase slab steel in amounts varying between 10,000 to 20,000 tons per month. Both of these contracts were entered prior to 1973, at a very attractive price. When the market strengthened in 1973, however, Sharon was unable to obtain the maximum monthly tonnages permitted under these contracts: U.S. Steel delivered only 30,000 tons per month and Wierton 10,000 tons per month.

insulated it from industry wide cost increases is correct, so far as it goes. Although Sharon was able to purchase steel slabs at pre-1973 prices, the district court's findings also indicate that it was not able to purchase, at those prices, a sufficient tonnage of steel slabs to meet its production requirements.[27] The district court also found that Sharon experienced substantial cost increases for other raw materials, ranging from 4% ton nearly 20%. In light of these facts, the finding regarding the fixed-price contract for slab steel, without more, cannot support an inference that Sharon was unaffected by the market shifts that occurred in 1973. Similarly, the district court's finding that Sharon entered a contract in November, 1972 which would yield only a slim profit does not support a conclusion that Sharon was willing to risk a loss on the contract. Absent a finding that the market shifts and the raw material price increases were foreseeable at the time the contract was formed—a finding which was not made—Sharon's willingness to absorb a loss cannot be inferred from the fact that it contracted for a smaller profit than usual. Finally, the findings regarding Sharon's profits are not sufficient, by themselves, to warrant a conclusion that Sharon was not justified in seeking a modification. Clearly, Sharon's initial profit on the contract[28] is an important consideration; the district court's findings indicate, however, that at the time modification was sought substantial future losses were foreseeable.[29] A party who has not actually suffered a loss on the contract may still seek a modification if a future loss on the agreement was reasonably foreseeable. Similarly, the overall profit earned by the party seeking modification is an important factor; this finding, however, does not support a conclusion that the decision to seek a modification was unwarranted. The more relevant inquiry is into the profit obtained through sales of the product line in question. This conclusion is reinforced by the fact that only a few product lines may be affected by market exigencies;[30] the opportunity to seek modification of a contract for the sale of goods of a product line should not be limited solely because some other product line produced a substantial profit.

In the final analysis, the single most important consideration in determining whether the decision to seek a modification is justified in this context is whether, because of changes in the market or other unforeseeable conditions, performance of the contract has come to involve a loss. In this case, the district court found that Sharon suffered substantial losses by performing the contract as modified. See note 29, supra. We are convinced that unforeseen economic exigencies existed which would prompt an ordinary merchant to seek a modification to avoid a loss on the contract; thus, we believe that the district court's findings to the contrary are clearly erroneous. See, e.g., U.S. for Use and Benefit of Crane Co. v. Progressive Enterprises, 418 F.Supp. 662, 664 (E.D.Va.1976); Official Comment 2, O.R.C. Sec. 1302.12 (U.C.C. Sec. 2–209); White & Summers, supra, at 41.

27. The district court found that Sharon suffered a continuing shortage of slab steel. It found that in 1972 (when Sharon was operating at substantially less than full capacity) it received 602,277 tons of slab steel; that in 1973, it received 506,596 tons of slab steel; and that in 1974 it received 373,898 tons. Thus, the record is clear that Sharon was in a difficult position. As demand for steel increased, and as Sharon's mills began to work at a higher capacity, its supply of slab steel steadily diminished.

28. The district court noted that in the first three months of 1973, Sharon made $3,089.00 on sales to Roth and lost $263.00 on steel sold to Toledo. Although Sharon lost significant sums of money on its contract with the plaintiffs, Sharon enjoyed overall profits in 1973, with net earnings of $11,566,000 on net sales of $338,205,000.

29. The evidence indicates, and the district court found, that with the exception of hot rolled sheets Sharon absorbed a loss on every rolled steel product which it sold to the defendants in 1973, even though the modified prices were in effect during the third and the fourth quarters.

30. Apparently, Sharon's record overall profit was the result of other operations. It obtained a pre-tax profit of less than one percent on its total sales of rolled steel.

The second part of the analysis, honesty in fact, is pivotal. The district court found that Sharon "threatened not to sell Roth and Toledo any steel if they refused to pay increased prices after July 1, 1973" and, consequently, that Sharon acted wrongfully. Sharon does not dispute the finding that it threatened to stop selling steel to the plaintiffs. Instead, it asserts that such a finding is merely evidence of bad faith and that it has rebutted any inference of bad faith based on that finding. We agree with this analysis; although coercive conduct is evidence that a modification of a contract is sought in bad faith, that prima facie showing may be effectively rebutted by the party seeking to enforce the modification. *E.g., Business Incentives, Inc. v. Sony Corp. of America*, 397 F.Supp. 63, 69 (S.D.N.Y.1975) (in context of economic duress, coercive conduct permissible in light of contractual right to terminate). *See Jamestown Farmers Elevator, Inc. v. General Mills*, 552 F.2d 1285, 1290 (8th Cir. 1977) ("good faith insistence upon a legal right [with coercive effect] which one believes he has usually is not duress, even if it turns out that that party is mistaken and, in fact, has no such right"); White & Summers, *supra*, at 41 (good faith exists if a party believes that contract permits party seeking modification to refuse to perform if modification not effected). Although we agree with Sharon's statement of principles, we do not agree that Sharon has rebutted the inference of bad faith that rises from its coercive conduct. Sharon asserts that its decision to unilaterally raise prices was based on language in the November 17, 1972 letter which allowed it to raise prices to the extent of any general industry-wide price increase. Because prices in the steel industry had increased, Sharon concludes that it was justified in raising its prices. Because it was justified in raising the contract price, the plaintiffs were bound by the terms of the contract to pay the increased prices. Consequently, any refusal by the plaintiffs to pay the price increase sought by Sharon must be viewed as a material breach of the November, 1972 contract which would excuse Sharon from any further performance. Thus, Sharon reasons that its refusal to perform absent a price increase was justified under the contract and consistent with good faith.

This argument fails in two respects. First, the contractual language on which Sharon relies only permits, at most, a price increase for cold rolled steel; thus, even if Sharon's position were supported by the evidence, Sharon would not have been justified in refusing to sell the plaintiffs hot rolled steel because of the plaintiffs' refusal to pay higher prices for the product. More importantly, however, the evidence does not indicate that Sharon ever offered this theory as a justification until this matter was tried. Sharon's representatives, in their testimony, did not attempt to justify Sharon's refusal to ship steel at 1972 prices in this fashion. Furthermore, none of the contemporaneous communications contain this justification for Sharon's action. In short, we can find no evidence in the record which indicates that Sharon offered this theory as a justification at the time the modification was sought. Consequently, we believe that the district court's conclusion that Sharon acted in bad faith by using coercive conduct to extract the price modification is not clearly erroneous. Therefore, we hold that Sharon's attempt to modify the November, 1972 contract, in order to compensate for increased costs which made performance come to involve a loss, is ineffective because Sharon did not act in a manner consistent with Article Two's requirement of honesty in fact when it refused to perform its remaining obligations under the contract at 1972 prices.[31]

---

31. The district court also found, as an alternative ground, that the modification was voidable because the plaintiffs agreed to the modification due to economic duress. *See, e.g., Oskey Gasoline & Royale Co. v. Continental Oil*, 534 F.2d 1281 (8th Cir.1976). Because we conclude that the modification was ineffective as a result of Sharon's bad faith, we do not reach the issue whether the contract modification was also voidable because of economic duress. We note, however, that proof that coercive means were used is necessary to establish that a contract is voidable because of economic duress. *Id.* at 1286. Normally, it cannot be used to

## III.

A. The district court concluded that Sharon's refusal to accept certain purchase orders requesting delivery during the months of October and December of 1973 resulted in a breach of the November 14, 1972 oral agreement.[32] Sharon asserted the affirmative defense of commercial impracticability,[33] arguing that demand far surpassed its decreasing production capabilities. Because the oral contract of November 14, 1972 was based upon the presupposed condition that raw materials sufficient to meet Sharon's contractual obligations would be available, and because sufficient raw materials were unavailable to meet demand, Sharon claims that strict performance of the contract is excused by O.R.C. Sec. 1302.73 (U.C.C. Sec. 2–615).[34] The district court, however, found that Sharon's policy of accepting more purchase orders than it was capable of filling was the direct cause of Sharon's inability to perform pursuant to the terms of the November 14, 1972 oral agreement and rejected Sharon's commercial impracticability defense.

 Generally, a party asserting the defense of commercial impracticability must prove that an unforeseeable event occurred, that the non-occurrence of the event was a basic assumption underlying the agreement, and that the event rendered performance impracticable O.R.C. Sec. 1302.73 (U.C.C. Sec. 2–615). *See, e.g., Neal-Cooper Grain Company v. Texas Gulf Sulfur Company*, 508 F.2d 283, 293 (7th Cir.1974). The evidence in this case supports Sharon's assertions that an unforeseeable raw material shortage occurred and that the non-occurrence of such a shortage was a basic assumption underlying the November 14, 1972 oral contract. The primary dispute involves the question whether the raw material shortage rendered Sharon's ability to perform the November, 1972 contract commercially impracticable. We believe that Sharon failed to affirmatively demonstrate that its alleged inability to perform was caused by the existing raw material shortage. Therefore, we affirm the district court's decision denying Sharon relief under O.R.C. Sec. 1302.73 (U.C.C. Sec. 2–615).

 To successfully assert the affirmative defense of commercial impracticability, the party must show that the unfore-

void a contract modification which has been sought in good faith; if a contract modification has been found to be in good faith, then presumably no wrongful coercive means have been used to extract the modification.

32. The evidence indicates that in June of 1973 Sharon informed plaintiffs that it would refuse any further hot rolled purchase orders for delivery in October and cold rolled purchase orders for delivery in December. Since Sharon was obligated to accept Roth's purchase orders for hot rolled steel in October and Toledo's purchase orders for cold rolled steel in December, Sharon's June letter refusing to perform amounted to an anticipatory repudiation of the November 14, 1972 oral agreement. *See Government of Republic of China v. Compass Communications*, 473 F.Supp. 1306 (D.Colo. 1979) (seller's unequivocal refusal to perform by word or conduct constitutes anticipatory repudiation). Ohio's statutory provision regarding anticipatory repudiation establishes a number of permissible alternatives that an aggrieved party may pursue. O.R.C. Sec. 1302.68 (U.C.C. Sec. 2–610). Roth, at the time of repudiation, chose to suspend its performance, whereas Toledo chose to submit December purchase orders and await performance for a commercially reasonable time. Both courses of action are permitted by O.R.C. Sec. 1302.68 (U.C.C. Sec. 2–610).

33. The Ohio statutory provision on commercial impracticability is O.R.C. Sec. 1302.73(A) (U.C.C. Sec. 2–615(a)). It provides in part, that:

Delay in delivery or non-delivery in whole or in part by a seller ... is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made ....

34. Sharon also raises the defense of commercial impracticability with regard to its increased production costs which occurred as a result of the steel crisis. In this regard, the district court found that Sharon's overall production costs increased by approximately 15% in 1973. Increases in the cost of production, however, do not, absent more, support a claim of commercial impracticability. *E.g., Transatlantic Financing Corp. v. United States*, 363 F.2d 312, 319 (D.C.Cir.1966). See Official Comment 4, O.R.C. Sec. 1302.73 (U.C.C. Sec. 2–615).

seeable event upon which excuse is predicated is due to factors beyond the party's control. *Chemetron Corp. v. McLouth Steel Corp.,* 381 F.Supp. 245 (N.D.Ill.), *aff'd,* 522 F.2d 469 (7th Cir.1974). This rule of law is simply a restatement of the causation requirement of O.R.C. Sec. 1302.73 (U.C.C. Sec. 2–615); if the factors which create the event are within the control of the party asserting commercial impracticability, then the inability to perform is the result of the party's conduct rather than the event itself. The record indicates that Sharon continued to accept an unprecedented amount of purchase orders during the first half of 1973 even though it knew that raw materials were in short supply.[35] In light of these facts, we believe that sufficient evidence supports the district court's conclusion that Sharon's inability to perform was a result of its policy accepting far more purchase orders than it was capable of fulfilling, rather than a result of the existing shortage of raw materials.

B. Unlike the 1973 contractual arrangement between plaintiffs and Sharon, the sale of steel during 1974 involved a series of contracts based on individual purchase orders and acknowledgements. The agreed price for these individual contracts was the prevailing price at the time of shipment. Throughout the calendar year 1974, the steel crisis prompted a steady increase in steel demand and, thus, in book prices. Sharon admits that it delivered a number of plaintiffs 1974 purchase orders well after the agreed delivery dates. In the district court, plaintiffs alleged that these late deliveries amounted to a breach of contract.[36] In response, Sharon asserted the affirmative defense of commercial impracticability pursuant to O.R.C. Sec. 1302.73 (U.C.C. Sec. 2–615). The district court held that plaintiffs waived any breach of contract claim for delivery delays of ninety days or less by their course of performance.[37] With regard to delays in excess of ninety days, however,

**35.** Mr. George D. Finch, Director of Planning and Production for Sharon, testified that in early 1973, Sharon began to run behind schedule because of the tremendous influx of orders and the shortage of materials. Finch also testified that Sharon's bookings were perhaps the greatest he had seen in his forty-three years in the steel industry and that the increase in the purchase order backlog led to Sharon's blanking policy.

**36.** Plaintiffs also claim breach of contract for Sharon's failure to deliver steel pursuant to 1973 and 1974 purchase orders. In early October, plaintiffs cancelled all outstanding 1974 purchase orders. Since delivery pursuant to 1974 cancelled purchase orders was more than ninety days late, we affirm the district court's conclusion that these non-deliveries amounted to a breach of contract. *See* note 38, *infra.* Moreover, we believe that the district court properly determined that plaintiffs' cancellations did not operate as a waiver of their right to assert breach of contract for non-deliveries. O.R.C. Sec. 1302.01(A)(14) (U.C.C. Sec. 2–106(4)); O.R.C. Sec. 1302.94 (U.C.C. Sec. 2–720).

Plaintiffs also raise claims for non-delivery involving purchase orders No. 002957 and No. 8391 which were issued in 1973. Purchase order No. 002957 is discussed at notes 52 and 54, *infra.* Roth cancelled purchase order No. 8391 in early October, 1974. Again, we believe that this cancellation did not operate as a waiver of plaintiff's right to assert breach of con-

tract. With regard to purchase order No. 8391, Sharon argues that its failure to deliver steel was due to Roth's issuance of "change orders". Essentially, change orders are alterations in requested steel specifications. Although the district court recognized that changes in specifications could cause a delay in shipment, it found that Sharon failed to prove the specific type of specification changes which would delay delivery. Moreover, the district court found that change orders issued subsequent to the agreed delivery date were the result of Roth's attempt to "put out fires" caused by Sharon's failure to deliver steel in accordance with the agreed delivery date. Since we believe that these findings are not clearly erroneous, we affirm the district court's conclusion that Sharon's non-delivery of steel pursuant to purchase order No. 8391 amounted to a breach of contract.

**37.** The record indicates that plaintiffs placed 1974 purchase orders with full knowledge that delivery delays up to 90 days were common in industry. Moreover, plaintiffs accepted 1974 late deliveries and paid prevailing book prices. In light of plaintiffs' consistent course of performance, we believe that the plaintiffs waived their right to assert breach of contract based on delivery delays up to 90 days. O.R.C. Sec. 1302.12(D) (U.C.C. Sec. 2–209(4)); O.R.C. Sec. 1302.11(C) (U.C.C. Sec. 2–208(3)). *See* Official Comment 12, O.R.C. Sec. 1302.01 (U.C.C. Sec. 2–106).

the district court concluded that Sharon's failure to comply with the express terms of O.R.C. Sec. 1302.73(B) (U.C.C. Sec. 2–615(b)) barred any relief based on commercial impracticability, and, thus, that these late deliveries were a breach.

A seller whose performance becomes partially impracticable must allocate production and deliveries before contractual obligations are excused by O.R.C. Sec. 1302.73(B) (U.C.C. Sec. 2–615(b)).[38] Generally, O.R.C. Sec. 1302.73(B) (U.C.C. Sec. 2–615(b)) requires that the seller devise a system of allocation which is "fair and reasonable." Although this statutory provision does not list all of the factors to be considered in determining whether a particular allocation system is fair and reasonable, it does require sellers to limit participation in the allocation system to customers under contract and regular customers. Thus an allocation system which includes participants other than customers under contract and regular customers is unreasonable.

Mr. McCracken, executive vice-president and chief operating officer of Sharon, testified that Sharon established a steel warehouse by "activating" a wholly owned subsidiary called Ohio Metal Processing Company in February or March of 1974 for the purpose of avoiding price control and that in March, 1974, Sharon begin diverting steel to this subsidiary warehouse. Although Ohio Metal Processing was incorporated in 1973, the record contains no evidence that this subsidiary was either a customer under contract with Sharon or a regular customer of Sharon when Sharon established its allocation system.[39] Because Sharon has failed to demonstrate that its subsidiary was within the class of permissible production participants, we believe that Sharon failed to allocate its production and deliveries in a fair and reasonable manner as required by O.R.C. Sec. 1302.73(B) (U.C.C. Sec. 2–615(b)).

Because a reasonable system of allocation is a prerequisite to relief pursuant to O.R.C. Sec. 1302.73 (U.C.C. Sec. 2–615), we affirm the district court's holding that delays in excess of ninety days amounted to a breach of contract.

## IV.

Sharon argues that the plaintiff's failure to give notice of breach as required by O.R.C. Sec. 1302.65(C)(1) (U.C.C. Sec. 2–607(3)(a)) bars them from seeking a remedy for the price increase and blanked months in 1973 and the late deliveries and non-deliveries in 1974. The district court concluded that notice was not necessary with regard to the late deliveries which were accepted, because Sharon had actual knowledge that the shipments were delinquent, O.R.C. Sec. 1301.01(Y)(1) (U.C.C. Sec. 1–201(25)(a)), and that, if notice was necessary, the plaintiffs gave adequate notice to Sharon by indicating that they regarded the price increase in 1973 and the late deliveries in 1974 to be breaches of contract. Further, the district court concluded that, in any event, notice of breach was not necessary for steel which was ordered but never delivered because Sec. 2–607 requires notice only with regard to accepted goods.

In analyzing this question, the threshold issue is whether any notice is required. The plaintiffs assert that O.R.C. Sec. 1302.65(C) (U.C.C. Sec. 607(3)) requires notice only when the breach cannot be readily discover-

---

**38.** A seller, whose performance is only partially affected by an unforeseeable event, must establish that his allocation of production and deliveries fulfills the requirements of O.R.C. Sec. 1302.73(B) (U.C.C. Sec. 2–615(b)). This section requires a seller to:

Allocate production and deliveries *among his customers* but may at his option include *regular customers* not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable. (emphasis added).

**39.** The record indicates that Sharon began allocating steel in the fall of 1973. Initially, the decision to establish a system of allocation was made by Sharon's chief operating officer, Walter E. Gregg. The testimony of George D. Finch, director of production and planning, corroborates Gregg's testimony that Sharon, in fact, implemented their allocation system in the fall of 1973.

ed because the tendered goods possess a latent defect. *Jay Zimmerman Co. v. General Mills, Inc.*, 327 F.Supp. 1198, 1204 (E.D. Mo.1971). In support of their position, the plaintiffs note that most of the cases involving U.C.C. Sec. 2–607(3) are breach of warranty cases concerning defective goods. *E.g., K & M Joint Venture v. Smith International*, 669 F.2d 1106 (6th Cir.1982); *Standard Alliance Industries, Inc. v. Black Clawson Co.*, 587 F.2d 813 (6th Cir.1978) *cert. denied*, 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979).

 We believe that the plaintiffs' position is inconsistent with the language of the statute. O.R.C. Sec. 1302.65(C) (U.C.C. Sec. 2–607(3)) requires notice of breach to be given "within a reasonable time after [the buyer] discovers or should have discovered *any breach* . . . " (emphasis added). The clear language "any breach" indicates that the statute applies to all breaches in which the goods are accepted. The language of a statute must be given its plain meaning, unless the intent of the legislature or the purposes served by the statute would be frustrated by such an interpretation. *Youngstown Club v. Porterfield*, 21 Ohio St.2d 83, 86, 255 N.E.2d 262 (1970). *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 200, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976); *Banks v. Chicago Grain Trimmers*, 390 U.S. 459, 465, 88 S.Ct. 1140, 1144, 20 L.Ed.2d 30 (1963).

 Moreover, the policies underpinning the statute reinforce our opinion that notice of breach is a condition precedent to any remedy for breach of a contract involving the sale of goods when those goods have been accepted. As this court has indicated, the notice provisions of U.C.C. Sec. 2–607 serve two policies:

First, express notice opens the way for settlement through negotiation between all parties. Second, proper notice minimizes the possibility of prejudice to the seller by giving him "ample opportunity to cure the defect, inspect the goods, investigate the claim or do whatever may be necessary to properly defend himself or minimize his damages while the facts are fresh in the minds of the parties."

*Standard Alliance Industries v. Black Clawson*, 587 F.2d 813, 826 (6th Cir.1978) (citations omitted); *Eastern Airlines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 972–73 (5th Cir.1976). *See* J. White & R. Summers, *supra*, at 344. These same purposes are served by requiring notice of breach in instances where the goods are conforming, but the performance is late, or at a higher price than the contract allows. Often, a seller's failure to conform to the terms of the contract may not amount to a clear breach. For example, his performance may not conform for reasons which are beyond his control and which would excuse his failure to perform. *See* O.R.C. Sec. 1302.73 (U.C.C. Sec. 2–615). Also, custom or usage of trade often permit deviations in performance, *see* O.R.C. Sec. 1302.-01(A)(2) (U.C.C. Sec. 2–103(1)(b)); O.R.C. Sec. 1302.11(C) (U.C.C. Sec. 2–208); a seller may believe his performance is acceptable, even though it does not strictly conform to the contract. *See generally,* O.R.C. Sec. 1302.48 (U.C.C. Sec. 2–504); O.R.C. Sec. 1302.70(C) (U.C.C. Sec. 2–612(3)). In short, non-conforming performance is often equivocal. The statute, by its terms, requires notice with regards to "any breach" and the same policies which support a rule requiring notice of breach when a latent defect is discovered also support a rule requiring notice of breach when performance does not conform to time or price terms of the contract. Thus, we hold that O.R.C. Sec. 1302.-65(C) (U.C.C. Sec. 2–607(3)) requires a buyer, who has accepted a non-conforming tender,[40] to give notice of breach to seller that he has not performed according to the terms of the contract. *Eastern Airlines v. McDonnell Douglas Corp.*, 532 F.2d at 972–

---

**40.** Sec. 2–607(3) by its own terms applies only when tendered goods have been accepted. *See* O.R.C. Sec. 1302.65(C). Thus, the plaintiffs were under no obligation to give notice of breach with regard to the goods which were never delivered and, thus, were never accepted by the plaintiffs. *See, e.g., Eastern Airlines, Inc. v. McDonald Douglas Corp.*, 532 F.2d at 973 n. 39.

73; *MacGregor v. McReki, Inc.,* 30 Colo. App. 196, 494 P.2d 1297 (1971).

Because the plaintiffs are required to provide Sharon with notice of breach regarding Sharon's price increases in 1973 and its late deliveries in 1974, they bear the burden of demonstrating that prompt and adequate notice of breach was given to Sharon. The plaintiffs, relying upon Official Comment 4 to Sec. 2–607 and O.R.C. Sec. 1301.01(Y) (U.C.C. Sec. 1–201(25)),[41] argue that they were only obligated to provide notice which informs the seller that the "transaction is still troublesome and must be watched." Official Comment 4, O.R.C. Sec. 1302.65 (U.C.C. Sec. 2–607). They argue that this obligation was discharged because Sharon either knew, O.R.C. Sec. 1301.01(Y)(1) (U.C.C. Sec. 1–201(25)(a)), or should have known, O.R.C. Sec. 1301.-01(Y)(3) (U.C.C. Sec. 1–201(25)(c)), that the plaintiffs were unhappy with Sharon's performance.

Although the plaintiff's argument is not without support, *see* Official Comment 4, O.R.C. Sec. 1302.65 (U.C.C. Sec. 2–607) this court has rejected this argument on two occasions. *K & M Joint Venture v. Smith International,* 669 F.2d 1106, 1113–14 (6th Cir.1982); *Standard Alliance Industries v. Black Clawson,* 587 F.2d at 825. *See Eastern Airlines, Inc. v. McDonnell Douglas Corp.,* 532 F.2d at 973; *Southern Illinois Stone Co. v. Universal Engineering,* 592 F.2d 446, 452 (8th Cir.1979) ("it is not enough that the seller be given notice of the mere facts constituting a nonconforming tender; he must also be informed that the buyer considers him to be in breach of the contracts."). Moreover, we believe that the Supreme Court of Ohio would also reject the plaintiff's argument. *See Eckstein v. Cummins,* 41 Ohio App.2d 1, 321 N.E.2d 897 (1974).

■ In light of these principles, we believe that the plaintiffs gave Sharon ample, timely notice of breach regarding the 1973 price increase. In March, 1973, when Sharon informed the plaintiffs of its intent to increase prices, Guerin immediately informed Sharon that, in the plaintiffs' opinion, the 1972 fixed-price agreement was enforceable and that the plaintiffs would sue to recover any losses if the price increase was actually imposed. Further, Guerin's replacement, Mecaskey, also informed Sharon, shortly after Sharon had extracted the modification agreement, that Sharon "had not met their legal or moral obligations." [42] Because of these timely and unequivocal statements, we believe that the plaintiffs have discharged their obligation, with regard to the 1973 price increase, to provide Sharon with timely notice that its conduct amounted to a breach of contract.

■ The late deliveries, however, present a more difficult problem. Clearly, the plaintiffs provided Sharon with notice of the plaintiffs' position that Sharon was in breach: on October 3, 1974, Mecaskey informed Sharon "that Sharon had not met its legal or moral obligations to us, and that their deliveries were totally unreliable . . . ." Although this statement is sufficient to provide Sharon with notice that the plaintiffs believed that Sharon was in breach, we entertain doubts regarding its timeliness. *See* O.R.C. Sec. 1302.65(C) (U.C.C. Sec. 2–607(3)) (notice must be given within reasonable time after breach discovered). The district court found, and the plaintiffs' purchasing officer Mecaskey admitted, that the plaintiffs discovered that Sharon's late deliveries were a breach of contract on May 9, 1974. Thus, the plaintiffs waited nearly five months before providing Sharon with notice of breach. *See* O.R.C. Sec. 1302.65(C)(1) (U.C.C. Sec. 2–607(3)(a)). The question whether the October, 1974 notice was timely, is a question of fact which must, in the first instance, be

---

**41.** O.R.C. Sec. 1301.01(Y) (U.C.C. Sec. 1–201(25)) provides: "that a person has notice of a fact when (a) he has actual knowledge of it; or (b) he has received a notice or notification of it; . . . ."

**42.** We express no opinion regarding the need for this statement. Because notice was given subsequent to the purported modification, we need not decide whether this second notice of breach was required by U.C.C. Sec. 2–607(3).

decided by the district court.[43] Therefore, we vacate the portion of the district court's order awarding damages for the 1974 late deliveries, and remand this case for findings regarding the timeliness of the October, 1974 notice.[44]

## V.

Sharon challenges several facets of the district court's award of damages.[45] It argues that the district court improperly awarded damages to the plaintiffs for Sharon's non-deliveries and that the district court improperly used the warehouse rather than the mill price for rolled steel in calculating damages under O.R.C. Sec. 1302.87 (U.C.C. Sec. 2–713).

First, Sharon asserts that the district court improperly allowed the plaintiffs to amend their complaint to seek damages un-der O.R.C. Sec. 1302.87 (U.C.C. Sec. 2–713). Initially, the plaintiffs had sought damages based upon the difference between the cost of cover and the contract price pursuant to O.R.C. Sec. 1302.86 (U.C.C. Sec. 2–712). Sharon argues that a party which has covered pursuant to O.R.C. Sec. 1302.86 (U.C.C. Sec. 2–712) cannot seek damages based upon a contract market differential under O.R.C. Sec. 1302.87 (U.C.C. Sec. 2–713). See Official Comment 5, O.R.C. Sec. 1302.87 (U.C.C. Sec. 2–713); J. White & R. Summers, *supra,* at 190–191. Thus, Sharon reasons that the plaintiffs, who initially pled a theory of recovery based on cover, should not have been permitted to amend their complaint to allege the inconsistent alternative theory.

▆ Initially, we note that the procedural context in which this question is

---

**43.** Because the district court concluded that any obligation imposed by U.C.C. Sec. 2–607(3) was discharged because of Sharon's awareness of the facts underlying the claims, the district court did not reach the issue of whether the October 3, 1974 notice was timely. Because no findings were made with regard to the timeliness of this notice, we cannot conclude whether the plaintiffs have discharged their obligation. *See K & M Joint Venture v. Smith International,* 669 F.2d at 1111–12 (sufficiency is mixed question of fact and law and freely reviewable; subsidiary findings, however, are questions of fact). Consequently, we must vacate and remand this question to the district court for the necessary findings of fact.

As the dissent correctly notes, the district court found that the plaintiffs satisfied the notice requirement; the passage quoted by the dissent, however, does not contain a finding that notice was given within a reasonable time after the breach was discovered. U.C.C. Sec. 2–607(3)(a). Notice of breach given five months after breach is discovered, unlike notice given immediately, may not be timely in every circumstance. Unlike the dissent, we are unwilling to conclude, in light of the lengthy delay between discovery and notice of breach and of the express findings of timeliness in other parts of the district court's opinion, that the district court implicitly found the notice to be timely.

**44.** In the context of an ongoing business relationship, a delay of nearly five months may be unreasonable. On remand, the district court should consider the question of timeliness in light of the policies which the notice requirement is intended to serve:

> Notice of breach serves two distinct purposes. First, express notice opens the way for settlement through negotiation between the parties. Second, proper notice minimizes the possibility of prejudice to the seller by giving him "ample opportunity to cure the defect, inspect the goods, investigate the claim or do whatever may be necessary to properly defend himself or minimize his damages while the facts are fresh in the minds of the parties."

*Standard Alliance Industries v. Black Clawson,* 587 F.2d at 826 (citations omitted). If the notice given by the plaintiffs was sufficient to provide Sharon an opportunity to settle the dispute and to provide an opportunity to prepare for litigation if settlement negotiations failed, then the notice is timely.

**45.** Sharon does not challenge the manner in which damages were measured with regard to the overcharges under the fixed price agreement; instead, it challenges the district court's finding that it was liable under the fixed price agreement. It also asserts that even if a fixed price agreement existed, it permitted price increases for cold rolled steel. Both of these arguments have been fully considered, *see* part II(b), *supra,* and do not merit further discussion.

Similarly, we do not decide whether the district court properly measured damages for Sharon's late deliveries in 1974; because we vacate that portion of the district court's award, the question of damages is not properly before us.

presented sharply limits the scope of our review.[46] Normally, the question of whether a party should be allowed to amend a pleading is committed to the sound discretion of the district court, and this court may disturb its decision only if we find an abuse of discretion. *Zenith Radio Corp. v. Hazeltine Research,* 401 U.S. 321, 330–31, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971); *Estes v. Kentucky Utilities Co.,* 636 F.2d 1131, 1133 (6th Cir.1980). Thus, Sharon must demonstrate that the district court abused its discretion by permitting the amendment either by demonstrating that it was prejudiced by the district court's decision, *Zenith Radio Corp. v. Hazeltine Research,* 401 U.S. at 330–31, 91 S.Ct. at 802, or by demonstrating that the complaint, as amended, could not withstand a motion to dismiss under Fed.R. Civ.P. 12(b)(6). *Neighborhood Development Corp. v. Advisory Council,* 632 F.2d 21, 23 (6th Cir.1980).

Sharon has not identified any prejudice which resulted from the district court's decision to allow the plaintiffs to amend their complaint. The amendment came early in the litigation; Sharon does not assert that it had insufficient time to conduct discovery under this new damage theory, that it was unfairly surprised by the change in theories, or that it was in any way unable to effectively rebut the plaintiff's new theory at trial (i.e., by offering evidence that the plaintiffs did, in fact, cover). In short, Sharon has failed to demonstrate that the amendment adversely affected its posture in the litigation. *Cf. Seifert v. Solem,* 387 F.2d 925, 929 (7th Cir.1967) (complaint properly amended to include exemplary damages on day of trial). *See also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

Similarly, Sharon has not shown that the pleading, as amended, fails to state a claim upon which relief could be granted. *Neighborhood Development Corp. v. Advisory Council,* 632 F.2d at 23; *Cooper v. American Employers Insurance Co.,* 296 F.2d 303, 307 (6th Cir.1961) ("[T]he proposed amended pleading ... should not be rejected unless it appears to a certainty that the pleader would not be entitled to any relief under it."). In determining whether an amended complaint states a claim, we must accept all factual allegations contained in the pleading as true, *id.* at 307, and resolve all factual ambiguities in favor of the party who sought the amendment. *Cooper v. American Employers Ins. Co.,* 296 F.2d at 307 ("pleading must be viewed in light most favorable to the pleader"). Finally, we note that a "motion under Rule 12(b)(6) is directed solely to the complaint itself." *Sims v. Mercy Hospital of Monroe,* 451 F.2d 171, 173 (6th Cir.1971); consequently, extrinsic evidence cannot be considered in determining whether the complaint states a claim. *See id. See also* Fed.R.Civ.P. 12(b). In light of these principles, we believe that the district court properly allowed the amendment. The amended complaint states a claim for damages under O.R.C. Sec. 1302.87 (U.C.C. Sec. 2–713) and contains no allegations regarding cover. Although Sharon asserts that a claim under O.R.C. Sec. 1302.87 (U.C.C. Sec. 2–713) is impermissible because the plaintiffs have covered, this is a question of fact.[47] Be-

---

**46.** In its reply brief, Sharon asserts that testimony at trial indicated that the plaintiffs actually covered and, as a matter of law, that the only damage theory available was a theory based on O.R.C. Sec. 1302.86 (U.C.C. Sec. 2–712). Inexplicably, Sharon failed to raise this issue in either its pretrial or post-trial memoranda. Moreover, we cannot find any indication in the record that this issue was raised in any context except in response to the plaintiffs' motion for leave to amend.

Because Sharon did not raise at trial the factual question whether the plaintiffs covered, the district court made no findings in that regard and did not consider whether the use of cover barred the plaintiffs from seeking damages under O.R.C. Sec. 1302.87 (U.C.C. Sec. 2–713). Since this matter was not raised in this context in the district court, we cannot consider the question upon review. *Olund v. Swarthout,* 459 F.2d 999, 1000 (6th Cir.) *cert. denied,* 409 U.S. 1008, 93 S.Ct. 441, 34 L.Ed.2d 301 (1972); *Wiper v. Great Lakes Engineering Works,* 340 F.2d 727, 731 (6th Cir.) *cert. denied,* 382 U.S. 812, 86 S.Ct. 28, 15 L.Ed.2d 60 (1965).

**47.** *See, e.g., American Carpet Mills v. Gunny Corp.,* 649 F.2d 1056, 1060 (5th Cir.1981); *Bigelow-Sanford, Inc. v. Gunny Corp.,* 649 F.2d 1060 (5th Cir.1981).

cause the amended complaint contains no allegations regarding cover,[48] and because Sharon could not properly rely upon extrinsic evidence of cover at this stage, the claims for damages under O.R.C. Sec. 1302.-87 (U.C.C. Sec. 2–713) are properly pleaded.

Second, Sharon challenges the market price which the district court used to measure damages pursuant to O.R.C. Sec. 1302.-87 (U.C.C. Sec. 2–713).[49] The district court concluded that the proper measure of damages was the difference between the contract price and the warehouse price[50] on the date the plaintiffs learned of the breach. The district court further found that, with one exception,[51] the plaintiffs learned of the breach on May 9, 1974. Consequently, the damages awarded reflect the difference between the contract price, which in 1974 was Sharon's published price ninety days after delivery was requested, see part III(b), supra, and the warehouse price for the appropriate type of steel on May 9, 1974.[52]

Sharon asserts that the district court improperly used the warehouse price to measure the plaintiffs' damages because ware-

**48.** In their brief, and in support of their motion for leave to amend, the plaintiffs have asserted that, after discovery was commenced, they discovered that they could not prove that they covered in conformity with U.C.C. Sec. 2–712. Essentially, they have explained their decision to amend as an effort to conform the pleadings to the facts.

**49.** O.R.C. Section 1302.87 (U.C.C. Sec. 2–713) provides, in part:

(A) The measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages.

**50.** The "warehouse price" is the price charged by warehouses for steel, prevailing at the time the plaintiffs would have covered. Essentially, the district court concluded that the proper measure of the market price was the price the plaintiffs would have paid for the goods if they had chosen to cover. See Official Comment 1, O.R.C. Sec. 1302.87 (U.C.C. Sec. 2–713). The district court concluded that no steel was available from the steel mills and, consequently, that the plaintiffs would have purchased the steel from warehouses had they chosen to cover. Because warehouses purchased steel from the mills and resold the steel to customers, at a premium price, warehouse prices were substantially higher than the mill price. See also note 6, supra.

**51.** With regard to the "blanking" policy of Sharon, the district court concluded that Sharon's refusal to accept orders pursuant to that policy accounted to an anticipatory repudiation. See note 32, supra. Because it treated Sharon's refusal to accept orders as a repudiation, it concluded that the market price to be used in computing damages was the mill price for steel at the time performance was due. See Cargill, Inc. v. Stafford, 553 F.2d 1222 (10th Cir.1977). Sharon does not challenge the time when the market was measured, apparently

conceding that U.C.C. Sec. 2–713 (market measured when buyer learns of breach) requires that the market be measured when performance was due, rather than when the repudiation was discovered. See Cargill, Inc. v. Stafford, 553 F.2d at 1226. J. White and R. Summers, supra, at 201–02 Sharon does argue, however, that the mill price was the proper measure of damages, rather than the warehouse price. We disagree, in light of the discussion below.

**52.** With regard to Roth purchase order No. 8391 and Toledo purchase order No. 002957, Sharon asserts that the district court improperly measured the market by referring to May 9, 1974, the date when the plaintiffs actually discovered Sharon's breach. Because both of these purchase orders were issued, acknowledged, and to be delivered in 1973, Sharon argues that the plaintiffs should have known of the breach by December, 1973 when the fixed-price contract expired and delivery was not forthcoming. Essentially, Sharon is arguing that the market price ought to be fixed on the date when the buyer should have learned of the breach. But see, U.C.C. Sec. 2–713(1) (market price used in computing damages is "the market price at the time when the buyer learned of the breach"). Sharon notes that the district court found that the exigencies of the market did not excuse strict adherence to the November, 1972 agreement; thus, Sharon argues that the plaintiffs must have learned of the breach by the time the contract expired.

We need not decide whether U.C.C. Sec. 2–713 ought to be construed to require that the market price be ascertained at the time that the buyer should have learned of the breach. In our view, the plaintiffs were justified in believing that delivery delays were the result of market exigencies even though the district court, in retrospect, declined to excuse the delays on that basis; thus, we conclude that the date the plaintiffs actually learned of the breach is the same as the date they should have learned of the breach.

houses are not "in the same branch of trade" as mills such as Sharon. Official Comment 3, O.R.C. Sec. 1302.87 (U.C.C. Sec. 2–713). Essentially, it contends that steel warehouses compete in a secondary market because they purchase rolled steel from the mills and resell it at a higher price. Sharon also argues that the warehouse price may not be used to compute damages based upon a contract price-market price differential because the warehouse price is a resale price. *See Everett Plywood Corp. v. United States,* 512 F.2d 1082, 1092 (Ct.Cl.1975).

█ We believe that the district court properly used the warehouse price in computing the plaintiffs' damages pursuant to U.C.C. Sec. 2–713. Normally, the market price to be used in computing damages under U.C.C. Sec. 2–713 is the price prevailing in the market "in which the buyer would have obtained cover had he sought relief." Official Comment 1, O.R.C. Sec. 1302.87 (U.C.C. Sec. 2–713). *See Everett Plywood Corp. v. United States,* 512 F.2d at 1092 (use of resale market to measure market price under U.C.C. Sec. 2–713 is inappropriate when no evidence was produced indicating that the plaintiff would have resorted to the resale market to cover). *See also J. White & R. Summers, supra,* at 182–83. Consequently, the proper inquiry is whether the plaintiffs, if they had chosen to cover, would have purchased rolled steel from a warehouse or from a mill. In this regard, the district court found that the plaintiffs could not have obtained steel from other mills to replace the tonnage that Sharon failed to deliver; consequently, the plaintiffs would have been forced to cover by purchasing rolled steel from warehouses at premium prices. The findings are fully

supported by the evidence and, thus, are not clearly erroneous. We hold that the district court did not err in measuring damages; if the plaintiffs had chosen to cover, they would have been forced to purchase the steel from warehouses.[53] Thus, the district court properly used the warehouse price to measure the plaintiffs' damages.

We have exhaustively reviewed the record, and have considered nearly every facet of the district court's decision. We believe, for the most part, that the district court has correctly resolved the factual and legal questions which the parties have so bitterly contested for the past eight years.[54] Regrettably, however, we cannot bring this long and costly litigation to an end; we must remand this case for factual findings regarding the timeliness of plaintiffs' notice of breach in 1974.

Accordingly, we affirm in part, vacate in part, and remand for further proceedings not inconsistent with this opinion.

MERRITT, Circuit Judge, concurring in part and dissenting in part.

I join in Parts I, II, III, and V of the Court's opinion, and I concur in most of the majority's discussion of the notice of breach issue in Part IV. I do not believe that a remand is necessary, however. Although the majority accurately identifies the principles that govern the notice requirement, I do not believe that they correctly apply those principles to this case.

Under the law of this Circuit, the adequacy of a plaintiff's alleged notice of breach is "a mixed question of fact and law." *K & M Joint Venture v. Smith International,* 669 F.2d 1106, 1111 (6th Cir.1982). Thus, in

**53.** Concededly, the evidence regarding the market in which the plaintiffs would have covered was in substantial conflict. The district court chose to credit the testimony favorable to the plaintiffs. After reviewing the record, we have concluded that the district court's decision in this regard is not clearly erroneous. Similarly, we believe that the district court's conclusion that the prevailing warehouse price at the time the plaintiffs would have covered was $22.00 per hundred weight, although disputed, is not clearly erroneous.

**54.** Sharon argues that its counterclaim should have been sustained because it shipped steel to plaintiff Toledo, to fill purchase order No. 002957, which had not been cancelled, and has not received payment.

The district court concluded that the counterclaim was without merit because Toledo rightfully rejected the steel. We agree. Sharon's delivery was nearly a year late and the price upon delivery was nearly twice the contract price. Such a tender was clearly non-conforming and was properly rejected.

reviewing an adequacy of notice issue, this Court must first determine whether the District Court employed the correct legal standard; if so, we should affirm the District Court decision if it is supported by substantial evidence. *K & M Joint Venture, supra,* at 1119 (Holschuh, J., concurring in part and dissenting in part). We should affirm rather than remand because the District Court has already found all the necessary facts and it committed no error in its findings.

In the instant case, Judge Manos invoked alternative grounds for his holdings on the two notice questions. Regarding the 1973 breach of the 1972 contract, Judge Manos held that because plaintiffs' acquiescence in the higher prices "was obtained in bad faith and by economic duress ... it was not necessary that the plaintiffs voice their objection to the increased prices upon receiving each delivery of steel in the third and fourth quarters of 1973." (Joint App. at 299 n. 15.) Judge Manos also expressly found, in the alternative, that even if notice was necessary under the circumstances, plaintiffs had complied with such a requirement:

> ... Sharon was provided adequate notice that the price increase was regarded as a breach of the contract of November 14, 1972, and notice was timely made when the new prices were imposed, and again in October of 1974, when Roth and Toledo terminated all outstanding orders on the books of Sharon.

*Id.* at 253. The District Court supported this finding by citing the various protests plaintiffs made after Sharon announced its price increase. *See id.* at 299 n. 15. In affirming the trial court on this notice issue, the majority catalogs precisely these protests, which, it proclaims, constitute timely notice of breach. The majority's apparent willingness to find *ab initio* that plaintiffs did give timely notice of breach of the 1972 contract ignores the District Court's own findings to that effect. Because this secondary finding does not depend on an incorrect legal standard, it should be subject to a "substantial evidence" standard of review.

The same reasoning compels me to disagree with the majority's disposition of the other notice issue, regarding the late deliveries in 1974. Here again, Judge Manos held first that he did not believe notice of breach was necessary. As an alternative ground for his dismissal of Sharon's notice argument, however, the District Court explicitly found that plaintiffs had indeed complied with any possible notice requirement under U.C.C. § 2–607:

> On the facts of this case, it would be improper to require that the plaintiffs notify the defendant that its shipments were delinquent—a fact of which it was already aware—upon receiving each late delivery of steel.... *If, in fact, such notice was required, the plaintiffs satisfied the requirement through numerous oral inquiries and complaints to Sharon by telephone and at meetings with its representatives in 1974.* Further notice was provided in letters from Mecaskey to Metzger. Mecaskey sent a letter dated April 3, 1974 which stated: "In view of today's steel situation, it is becoming increasingly difficult to effectively plan our production. Not only must we contend with lessened steel availability, but with shipping schedules which are increasingly erratic and often having little or no correlation to the wanted date or original promise." And in a letter dated April 23, 1974, Mecaskey informed Metzger that Roth and Toledo had become "increasingly disturbed by the deteriorization in Sharon's services" (Plaintiff's Exhibit 10). Moreover, Sharon received written and oral notice from the plaintiffs in October and November of 1974 complaining that its totally arbitrary business actions were regarded as a breach of its contractual and moral obligations to Roth and Toledo. The court accordingly finds no merit in Sharon's claim that the plaintiffs should be barred from any remedy for late deliveries in 1974 for failure to provide notice of breach. (citations omitted) (emphasis supplied).

*Id.* at 267–68.

In remanding the issue of the timeliness of plaintiffs' notice regarding the 1974 late

deliveries, the majority needlessly prolongs this already protracted litigation by ordering the District Court to repeat a finding that it has already made. I, therefore, respectfully dissent from that portion of the Court's opinion vacating the District Court's order awarding damages for the 1974 late deliveries and remanding the case for findings as to the timeliness of plaintiff's notice of breach.